## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | |
|---|---|
| Christie Stinson, Haley Beasley, Demetra Doss, Karen Ester, John Farley, David Knighten, and William Sidler, Jr., *individually and on behalf all others similarly situated,* <br><br> Plaintiffs, <br><br> v. <br><br> Yum! Brands, Inc., <br><br> Defendant. | Case No. 3:23-CV-183-DJH <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Christie Stinson, Haley Beasley, Demetra Doss, Karen Ester, John Farley, David Knighten, and William Sidler, Jr. ("Plaintiffs"), bring this action on behalf of themselves and all others similarly situated against Defendant Yum! Brands, Inc. ("Yum! Brands" or "Defendant"). Plaintiffs seek to obtain damages, restitution, and injunctive relief for a class of individuals ("Class" or "Class Members") who are similarly situated and have received notices of the data breach from Yum! Brands or from its franchisees or associates. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

### I.    NATURE OF THE ACTION

1.    This class action arises out of a massive January 2023 ransomware attack that resulted in the breach of documents and information stored on the computer network of Yum! Brands, a company that franchises and/or operates a system of over 55,000 restaurants in more than 155 countries and territories (the "Data Breach" or "Breach"). The Data Breach was

committed by cybercriminals who targeted and exfiltrated this information for profit and the purpose of engaging in identity theft to the detriment of Plaintiffs and Class Members.

2.      As Yum! Brands admits in its model Notice of Security Breach Letter, "Yum! experienced a cybersecurity incident involving unauthorized access to certain of our systems on or around January 13, 2023."[1]

3.      On its computer systems and network, Yum! Brands holds and stores certain highly sensitive personally identifiable information ("PII" or "Private Information") of the Plaintiffs and the Class Members, who are applicants who sought employment from a restaurant owned, operated, franchised through, or acquired by Yum! Brands or persons who are current or former employees of Yum! Brands, its franchises, or its acquisitions. In other words, the Plaintiffs and Class include (but may not be limited to) individuals who provided their highly sensitive and private information in exchange for employment opportunities.

4.      The Private Information compromised in the Data Breach includes highly sensitive data that represents a gold mine for data thieves, including but not limited to, names, addresses, dates of birth, driver's license numbers, identification card information, and Social Security numbers that Yum! Brands collected from its current, former, and prospective employees and maintained in its system.

5.      The specific data, which was compromised in the Data Breach, are highly sensitive, protected information that can and almost certainly will be used to commit identity theft against Plaintiffs and Class Members.

6.      Although the Breach was discovered in March 2023, it was not until April2023—a

---

[1] *See Data Breach Notifications*, https://apps.web.maine.gov/online/aeviewer/ME/40/b85bfcfb-4ff7-419e-8dd2-95e8f41a5ad1.shtml (last accessed Jan. 2, 2024).

month later—that Defendant informed the public of the Data Breach.[2] Upon information and belief, Data Breach notifications were sent and approved both directly by Yum! Brands and by the franchisees and owners who use Yum! Brands' computer network for business purposes.

7. Yum! Brands was required to begin notifying victims of its Data Breach as soon as possible, informing them that their PII had been stolen in a data breach affecting an unknown number of individuals. However, after the Data Breach, Defendant failed to provide timely notice to Plaintiffs and Class Members—thereby exacerbating their injuries. Ultimately, Defendant deprived Plaintiffs and Class Members of the chance to take speedy measures to protect themselves and mitigate harm.

8. Plaintiffs' and Class Members' highly sensitive personal information, entrusted to Yum! Brands and its associated or acquired franchisees and restaurants, was compromised, intentionally accessed, and removed by the cybercriminals for profit and, upon information and belief, remains in the hands of those very same cybercriminals.

9. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Plaintiffs and Class Members' Private Information.

10. Defendant disregarded the privacy and property rights of Plaintiffs and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members prompt and

---

[2] *Id.*

accurate and complete notice of the Data Breach.

11.     In addition, Defendant failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant properly monitored its computer networks, it would have discovered the intrusion promptly, and potentially been able to stop the intrusion or mitigate the injuries to Plaintiffs and the Class.

12.     Plaintiffs' and Class Members' identities are now at substantial and imminent risk of harm and identity theft because of Defendant's negligent conduct. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

13.     As a result of the Data Breach, Plaintiffs and Class Members are already suffering from fraudulent activities and have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and for years into the future closely monitor their personal and financial accounts to guard against identity theft.

14.     As a result of Yum! Brands' Data Breach, Plaintiffs and thousands of Class Members suffered ascertainable losses in the form of identity theft, out-of-pocket expenses, the loss of the benefit of their bargain, diminution in the value of their PII, and the value of their time they reasonably have incurred and will incur remedying and mitigating the effects of the Breach.

15.     Plaintiffs and Class Members are likely to incur out of pocket costs for unreimbursed fraudulent charges, purchasing credit monitoring services, credit freezes, credit

reports, or other protective measures to deter and detect identity theft.

16.     Accordingly, Plaintiffs bring this action against Defendant for (i) negligence; (ii) breach of implied contract; (iii) unjust enrichment; (iv) invasion of privacy; (v) breach of implied covenant of good faith and fair dealing; (vi) breach of confidence; and (vii) declaratory relief, seeking redress for Yum! Brands' unlawful conduct.

17.     Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate, long-term credit monitoring services funded by Defendant, and declaratory relief.

## II.     PARTIES

18.     Plaintiff Christie Stinson, an individual, is a resident and citizen of the State of Kentucky.

19.     Plaintiff Haley Beasley, an individual, is a resident and citizen of the State of Indiana.

20.     Plaintiff Demetra Doss, an individual, is a resident and citizen of the State of Illinois.

21.     Plaintiff Karen Ester, an individual, is a resident and citizen of the State of Pennsylvania.

22.     Plaintiff John Farley, an individual, is a resident and citizen of the State of South Carolina.

23.     Plaintiff David Knighten, an individual, is a resident and citizen of the State of North Carolina.

24.     Plaintiff William Sidler, Jr., an individual, is a resident and citizen of the State of

Florida.

25.    Yum! Brands, Inc., is a publicly held for profit corporation, organized under the laws of North Carolina, and headquartered in Louisville, Kentucky. Yum! Brands' principal place of business is located at 1441 Gardiner Lane, Louisville, Kentucky 40213. Defendant can be served through its registered agent CT Corporation System at 306 W. Main Street, Suite 512, Frankfort, Kentucky 40601.

### III.    JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

27.    The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business or business venture in this State; it is registered with the Secretary of State as a corporation; it maintains its headquarters in Kentucky; and committed tortious acts in Kentucky.

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which Yum! Brands is headquartered and has the most significant contacts.

### IV.    STATEMENT OF FACTS

**Nature of Defendant's Business**

29.    Yum! Brands claims that it is "the world's largest restaurant company, our diversified global system includes approximately 1,500 franchisees operating more than 55,000 restaurants in over 155 countries and territories." Its restaurant brands include KFC, Taco Bell,

Pizza Hut, and The Habit Burger Grill.[3]

30.     As of December 31, 2022, the Yum! Brands and its subsidiaries employed approximately 23,000 employees in the United States Approximately 85% of its employees work in restaurants while the remainder work in our restaurant-support centers. In the United States, approximately 90% of its Company owned restaurant employees are part-time and approximately 50% have been employed by the Company for less than a year.[4]

31.     Yum! Brands, and its franchisees, in the regular course of business, collect and maintain the PII of current and former employees and applicants for jobs, as a requirement of its business practices. In addition, upon information and belief, when Yum! Brands acquires a restaurant chain, it also acquires and takes responsibility for the PII that the acquired entity stored on its computer networks.

32.     In its annual report, Yum! Brands discusses at length its known risks related to technology and data privacy.[5] To quote in relevant part:

> Our business relies heavily on computer systems, hardware, software, technology infrastructure and online websites, platforms and networks (collectively, "IT Systems") to support both internal and external, including franchisee-related, operations. We own and manage some of these IT Systems but also rely on third parties for a range of IT Systems and related products and services. In addition, we and other parties (such as vendors and franchisees), collect, transmit and/or maintain certain personal, financial and other information about our customers, employees, vendors and franchisees, as well as proprietary information pertaining to our business (collectively, "Confidential Information"). The security and availability of our IT Systems and Confidential Information is critical to our business and regulated by evolving and increasingly demanding laws and regulations in various jurisdictions, certain third-party contracts and

---

[3] *See Yum! Brands Annual Report* at 1, https://investors.yum.com/financial-information/sec-filings/sec-filings-details/default.aspx?FilingId=16436331# (last accessed Feb. 12, 2024).
[4] *Id.* at 6.
[5] *Id.* at 12–15.

industry standards. [6]

33.      Yum! Brands is aware of the risks of cyberattacks, like it experienced in January 2023, and is equally aware of its responsibility to protect the Private Information entrusted to it. In its annual report, Yum! Brands states, "We experience cyber-attacks and security incidents from time to time and we may experience such attacks and incidents in the future. Despite the security measures that we and many third parties have implemented, our IT Systems may be disrupted or damaged and our Confidential Information may be compromised, corrupted, lost or stolen."[7]

34.      Yum! Brands and each of its acquisitions' and franchisees' employees, former employees, and job applicants provided it with PII with the mutual understanding that this highly sensitive private information was confidential and would be properly safeguarded from misuse and theft.

35.      While collecting and acquiring the Private Information from individuals, including Plaintiffs and Class Members, Yum! Brands promised to provide confidentiality and adequate security for the Private Information it collected in compliance with the statutory privacy requirements applicable to its industry.

36.      Yum! Brands is aware of its legal privacy obligations, the risks of cyber threats, and that it had obligations created by the FTC Act, contract, industry standards, and common law to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

37.      Plaintiffs and the Class Members relied on the promises and duties of Yum! Brands and its franchisees to keep their sensitive PII confidential and securely maintained, to use this

---

[6] *Id.* at 12.
[7] *Id.* at 13.

information for business purposes only, and to make only authorized disclosures of this information.

38.    Employees and individuals, in general, demand that businesses that require highly sensitive PII will provide security to safeguard their PII, especially when Social Security numbers are involved.

39.    In the course of their dealings, including Plaintiffs and Class Members, provided Yum! Brands (either directly or through its acquisitions, business associates, or franchisees) with all or most of the following types of Private Information:

- first and last names;

- home addresses;

- dates of birth;

- financial information;

- photo identification and/or driver's licenses;

- email addresses;

- phone numbers; and

- Social Security numbers.

40.    In the course of its business, Defendant obtains information on its employees including salary, work performance, familial, and other information.

41.    Plaintiffs and Class Member transferred their PII to Defendant for the purposes of facilitating services from and employment with Defendant and with the agreement and understanding that the PII would be adequately safeguarded and/or destroyed within a reasonable time after the termination of the respective relationship.

42.    Plaintiffs and Class Members, as current or former employees or customers,

reasonably relied on Defendant to keep their sensitive PII confidential; to maintain its system security; to use this information for business purposes only; and to make only authorized disclosures of their PII.

43.     Because of the highly sensitive and personal nature of the information Defendant acquires and stores, Defendant knew or reasonably should have known that it must comply with federal and state laws protecting customers' PII and provide adequate notice to customers and employees if their PII is disclosed without proper authorization.

44.     Because of the highly sensitive and personal nature of the information Defendant acquires and stores, Defendant knew or reasonably should have known that Plaintiffs and the Class Members reasonably relied on Defendant to keep their sensitive PII confidential; to maintain its system security; to use this information for business purposes only; and to make only authorized disclosures of their PII.

45.     By obtaining, collecting, receiving, and/or storing Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew, or should have known, that it was thereafter responsible for protecting Plaintiffs' and Class Members' PII from unauthorized disclosure.

46.     Yum! Brands had obligations created by contract, industry standards, and common law to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

47.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII, including but not limited to, protecting their usernames and passwords, using only strong passwords for their accounts, and refraining from browsing potentially unsafe websites.

48.     Upon information and belief, Defendant does not follow its own policies or industry standard practices in securing customers' and employee's PII.

49.     Upon information and belief, Defendant failed to ensure the proper monitoring and logging of the ingress and egress of network traffic.[8]

50.     Upon information and belief, Defendant failed to ensure the proper monitoring and logging of file access and modifications.[9]

51.     Upon information and belief, Defendant failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data breaches, security incidents, or intrusions.[10]

52.     Upon information and belief, Defendant failed to ensure the proper encryption of Plaintiffs' and Class Members' PII.[11]

53.     Upon information and belief, Defendant inadequately trains its employees and cybersecurity partners on cybersecurity policies and then fails to enforce those policies.

54.     Upon information and belief, Defendant failed to maintain reasonable and adequate security practices over its systems storing Plaintiffs' and Class Members' PII.

55.     Yum! Brands had a duty to adopt reasonable measures to protect Plaintiffs' and Class Members' PII from unauthorized disclosure to third parties.

56.     If Yum! Brands had adopted reasonable measures to protect Plaintiffs' and Class Members' PII from unauthorized disclosure to third parties, for example, properly encrypting Plaintiffs' and Class Members' PII, the Breach would not have occurred or at minimum, its effects

---

[8] *See Data Breach Notifications*, *supra* note 1 (noting that the Breach occurred on January 13, 2023, but was not discovered until March 9, 2023) (last accessed Feb. 12, 2024).
[9] *Id.* (same).
[10] *Id.* (same).
[11] *Id*. (noting that "the exposed files contained some of your personal information").

would have been mitigated.[12]

**The Data Breach**

57.     In its sample notice letter sent to the Maine Attorney General, Yum! Brands states that it "experienced a cybersecurity incident involving unauthorized access to certain of our systems on or around January 13, 2023."[13]

58.     According to its Annual Report, Defendant experienced a ransomware attack on January 13, 2023, that "resulted in the closure of fewer than 300 restaurants in one market for one day, temporarily disrupted certain of our affected systems and *resulted in data being taken from our network.*"[14]

59.     Although this summary attempts to downplay the severity of the Data Breach, Yum! Brands Data Breach was severe enough to force the closure of restaurants and resulted in the actual exfiltration of data and Personal Information.

60.     According to Notice Letters sent to Plaintiffs and Class Members, the Private Information compromised in the Data Breach included: names, addresses, dates of birth, and/or social security numbers.[15]

61.     Although the Data Breach occurred on January 13, 2023, it was not until April 7, 2023, that Defendant provided notice of the Data Breach to Plaintiffs and Class Members.

---

[12] *Id.* (noting that immediate time following after its discovery of the Breach, Defendant was able to "lock down impacted systems, . . . recover from the incident, and deploy[] enhanced 24/7 detection and monitoring technology"); 2023-04-07 Charter Foods Data Breach Notice to Consumers.pdf (vermont.gov) (noting that since the Breach, Defendant has taken "appropriate measures to prevent a similar situation in the future. Since the Incident we have implemented a series of cybersecurity enhancements, including installation of additional endpoint detection and response software, installation of new firewalls, implementation of additional threat analysis protocols, and rebuilding affected servers.").

[13] *Data Breach Notifications*, *supra* note 1 (last accessed Jan. 2, 2024).

[14] *Yum! Brands Annual Report* at 13, *supra* note 3.

[15] *See, e.g.*, Notice Letter of Plaintiff Stinson, attached as Exhibit A.

Therefore, **Plaintiffs' and Class members' PII was in the hands of cybercriminals for at least three months before they were notified** of the Data Breach. Time is of the essence when trying to protect against identity theft after a data breach, making early notification critical.

62.     Because of this targeted, intentional cyberattack, data thieves were able to gain access to and obtain data from Yum! Brands' computers, data which included the highly sensitive Private Information of Plaintiffs and Class Members.

63.     Yum! Brands admits in its Annual Report that the ransomware attack "disrupted certain of our affected systems and resulted in data being taken from our network."[16]

64.     Upon information and belief, the Private Information stored on Yum! Brands' network was not encrypted.

65.     Plaintiffs' Private Information was accessed and stolen in the Data Breach. Plaintiffs reasonably believe their stolen Private Information is currently available for sale on the Dark Web because that is the *modus operandi* of cybercriminals who target businesses that collect highly sensitive Private Information.

66.     As a result of the Data Breach, Yum! Brands now encourages Class Members to enroll in credit monitoring, fraud consultation, and identity theft restoration services, a tacit admission of the imminent risk of identity theft faced by Plaintiffs and Class members.[17] "As a matter of general precaution, it is always good practice to be vigilant against identity theft and fraud by reviewing your account statements and monitoring any available credit reports for unauthorized or suspicious activity, and by taking care in response to any email, telephone or other contacts that ask for personal or sensitive information (*e.g.*, phishing). Yum! will never request

---

[16] *See Yum! Brands Annual Report* at 13, *supra* note 3 (last accessed January 2, 2024).
[17] *See, e.g.*, Exhibit A.

sensitive information by phone or email. You may also review the attached *Steps You Can Take to Help Protect Your Information* as a helpful resource."[18] In other words, all time spent mitigating the impact of the Data Breach by Plaintiffs' and the Class was expended upon the advice of Yum! Brands.

67.     Upon information and belief, the Data Breach was perpetrated by a "financially-motivated, Russian-speaking" group of cybercriminals known as LockBit.[19] LockBit offers ransomware as a service (RaaS) software and thus its attacks involve additional malicious actors and affiliates who are willing to pay for its services.[20]

68.     Upon information and belief, the Data Breach was the result of a phishing attack likely involving a Yum! Brands employee falling prey to a phishing email.[21]

69.     Upon information and belief, LockBit has previously threatened to and published online data exfiltrated from its data breach victims.[22] On one occasion, LockBit hackers published 43 gigabytes of stolen Boeing data.[23]

### *Defendant Acquires, Collects, and Stores Plaintiffs' and Class Members' PII.*

70.     Yum! Brands acquires, collects, and stores a massive amount of personally identifiable information ("PII") of individuals who are employed or seeking employment through it or its franchisees.

---

[18] *Data Breach Notifications*, *supra* note 1 (last accessed Jan. 2, 2024).

[19] https://www.cbc.ca/news/politics/cse-lockbit-threat-1.6734996 (last accessed Feb. 16, 2024).

[20] https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-165a (last accessed Feb. 16, 2024).

[21]     https://www.trendmicro.com/vinfo/us/security/news/ransomware-spotlight/ransomware-spotlight-lockbit (last accessed Feb. 16, 2024).

[22] https://blogs.vmware.com/security/2022/10/lockbit-3-0-also-known-as-lockbit-black.html (last accessed Feb. 16, 2024); https://www.cshub.com/attacks/news/lockbit-hackers-publish-43gb-of-stolen-boeing-data-following-cyber-attack (last accessed Feb. 16, 2024).

[23]     https://www.cshub.com/attacks/news/lockbit-hackers-publish-43gb-of-stolen-boeing-data-following-cyber-attack.

71.     By obtaining, collecting, and using Plaintiffs' and Class Members' PII for its own financial gain and business purposes, Defendant assumed legal and equitable duties and knew that it was responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

72.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

73.     Plaintiffs and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### The Data Breach Was a Foreseeable Risk of which Defendant Was on Notice

74.     It is well known that PII, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cyber criminals. Companies that collect such information, including Yum! Brands, are well aware of the risk of being targeted by cybercriminals.

75.     Individuals place a high value not only on their PII, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

76.     A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are

not reimbursed (*e.g.*, postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[24]

77.     Individuals, like Plaintiffs and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hacker's purposes.

78.     Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiffs and Class Members cannot obtain new numbers unless they become a victim of social security number misuse.

79.     The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[25]

80.     In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[26]

81.     Additionally in 2021, there was a 15.1% increase in cyberattacks and data breaches since 2020. Over the next two years, in a poll done on security executives, they have predicted an

---

[24] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2021, NCJ 256085), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Jan. 2, 2024).

[25] https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Jan. 2, 2024).

[26]     https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last accessed Jan. 2, 2024).

increase in attacks from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[27]

82.     In light of high profile data breaches at other industry leading companies, including Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that its computer network would be targeted by cybercriminals.

83.     Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

84.     According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[28] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[29]

85.     Companies should treat ransomware attacks as any other data breach incident

---

[27] https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last accessed Jan. 2, 2024).

[28] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last accessed Jan. 2, 2024).

[29] *Id.*

because ransomware attacks don't just hold networks hostage, "ransomware groups sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[30]  As cybersecurity expert Emisoft warns, "[a]n absence of evidence of exfiltration should not be construed to be evidence of its absence […] the initial assumption should be that data may have been exfiltrated."

86.     An    increasingly    prevalent    form    of    ransomware    attack    is    the "encryption+exfiltration" attack in which the attacker encrypts a network and exfiltrates the data contained within.[31]  In 2020, over 50% of ransomware attackers exfiltrated data from a network before encrypting it.[32] Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[33] And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[34]

87.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Yum! Brands failed to take appropriate steps to protect the PII of Plaintiffs and the proposed Class from being compromised.

---

[30]  *Ransomware: The Data Exfiltration and Double Extortion Trends*, available at https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends.

[31]*The chance of data being stolen in a ransomware attack is greater than one in ten*, available at https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/

[32]  *2020 Ransomware Marketplace Report*, available at https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report.

[33] *Id*.

[34] *Id*.

***At All Relevant Times Defendant Had a Duty to Plaintiffs and Class Members
to Properly Secure their Private Information***

88.     At all relevant times, Yum! Brands had a duty to Plaintiffs and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train its employees, utilize available technology to defend its systems from invasion, act reasonably to prevent foreseeable harm to Plaintiffs and Class Members, and to <u>promptly</u> notify Plaintiffs and Class Members when Yum! Brands became aware that their PII was compromised.

89.     Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information. Accordingly, Defendant breached its common law, statutory, and other duties owed to Plaintiffs and Class Members.

90.     Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

        a.     maintaining a secure firewall configuration;

        b.     maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

        c.     monitoring for suspicious or irregular traffic to servers;

        d.     monitoring for suspicious credentials used to access servers;

        e.     monitoring for suspicious or irregular activity by known users;

        f.     monitoring for suspicious or unknown users;

        g.     monitoring for suspicious or irregular server requests;

        h.     monitoring for server requests for PII;

        i.     monitoring for server requests from VPNs; and

        j.     monitoring for server requests from Tor exit nodes.

91.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[35] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[36]

92.     The ramifications of Defendant's failure to keep Plaintiffs' and the Class Members' PII secure are long lasting and severe. Once PII is stolen, particularly Social Security and driver's license numbers, fraudulent use of that information and damage to victims including Plaintiffs and the Class may continue for years.

### *The Value of Personal Identifiable Information*

93.     The PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200.[37]

94.     Criminals can also purchase access to entire company's data breaches from $900 to $4,500.[38]

95.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult

---

[35] 17 C.F.R. § 248.201 (2013).

[36] *Id*.

[37] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Jan. 2, 2024).

[38] *In the Dark*, VPNOverview (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Jan. 2, 2024).

for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[39]

96.     Attempting to change or cancel a stolen Social Security number is difficult if not nearly impossible. An individual cannot obtain a new Social Security number without evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

97.     Even a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[40]

98.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than

---

[39] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Jan. 2, 2024).

[40] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed Jan. 2, 2024).

10x on the black market."[41]

99.     PII can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number.  This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[42]

100.    Given the nature of this Data Breach, it is foreseeable that the compromised PII can be used by hackers and cybercriminals in a variety of devastating ways. Indeed, cybercriminals who possess Class Members' PII can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

101.    The Private Information compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

102.    Moreover, Yum! Brands and its franchisees (like Charter Foods, Inc.) have offered only a limited one- or two-year subscription for identity theft monitoring and identity theft protection.[43] Its limitation is inadequate when victims, including Plaintiffs and Class are likely to face many years of identity theft.

103.    Furthermore, Defendant's credit monitoring offer and advice to Plaintiffs and Class Members squarely places the burden on Plaintiffs(s) and Class Members, rather than on the Defendant, to monitor and report suspicious activities to law enforcement. In other words,

---

[41] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Jan.2, 2024).

[42] *See* Office of Mgmt. & Budget, OMB Memorandum M-07-16 n.1 (last accessed Jan. 2, 2024).

[43] *Compare* Plaintiff Stinson's Notice Letter (1 year), Exhibit A *to* Plaintiff Sidler's Notice Letter (2 years), Exhibit B, *to* https://apps.web.maine.gov/online/aeviewer/ME/40/b85bfcfb-4ff7-419e-8dd2-95e8f41a5ad1.shtml offering two-years (last accessed Jan. 2, 2024).

Defendant expects Plaintiffs and Class Members to protect themselves from its tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiffs and Class Members in credit monitoring services upon discovery of the breach, Defendant merely sent instructions to Plaintiffs and Class Members about actions they can affirmatively take to protect themselves.

104.    These services are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' PII.

105.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Yum! Brands' failure to implement or maintain adequate data security measures for the victims of its Data Breach.

### Defendant Failed to Comply with FTC Guidelines

106.    Federal and State governments have established security standards and issued recommendations to mitigate the risk of data breaches and the resulting harm to consumers and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[44]

107.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[45] The guidelines note businesses should protect the personal consumer and

---

[44] FTC, *Start With Security, available at*: https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Jan. 2, 2024).

[45] FTC, *Protecting Personal Information: A Guide for Business, available at*: https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed Jan. 2, 2024).

consumer information that they keep, as well as properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

108.    The FTC emphasizes that early notification to data breach victims reduces injuries: "If you quickly notify people that their personal information has been compromised, they can take steps to reduce the chance that their information will be misused" and "thieves who have stolen names and Social Security numbers can use that information not only to sign up for new accounts in the victim's name, but also to commit tax identity theft. People who are notified early can take steps to limit the damage."[46]

109.    The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[47]

110.    The FTC recommends that businesses:

   a.  Identify all connections to the computers where you store sensitive information.

   b.  Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

   c.  Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

   d.  Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a

---

[46]    https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business   (last accessed Jan. 2, 2024).

[47]    *See* FTC, *Start With Security*, *supra* note 44/

business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.  Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks.

f.  Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.  Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h.  Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i.  Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

25

111.     The FTC has brought enforcement actions against businesses for failing to protect consumer and consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

112.     Because Class Members entrusted Defendant with their PII, Defendant had, and has, a duty to the Plaintiffs and Class Members to keep their PII secure.

113.     Plaintiffs and the other Class Members reasonably expected that when they provide PII to Yum! Brands and its franchisees, Defendant would safeguard their PII.

114.     Yum! Brands was at all times fully aware of its obligation to protect the personal and financial data of consumers, including Plaintiffs and members of the Class. Yum! Brands was also aware of the significant repercussions if it failed to do so. Its own Annual Report, quoted above, acknowledges this awareness.

115.     Yum! Brands' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—including Plaintiffs' and Class Members' first names, last names, addresses, and Social Security numbers, and other highly sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

### *Concrete Injuries are Caused by Defendant's Inadequate Security.*

116.     Plaintiffs and Class Members reasonably expected that Defendant would provide adequate security protections for their PII, and Class Members provided Defendant with sensitive personal information, including their names, addresses, and Social Security numbers.

117.    Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. Plaintiffs and other individuals whose PII was entrusted with Defendant understood and expected that, as part of that business relationship, they would receive data security, when in fact Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received data security that was of a lesser value than what they reasonably expected.  As such, Plaintiffs and the Class Members suffered pecuniary injury.

118.    Cybercriminals intentionally attack and exfiltrate PII to exploit it. Thus, Class Members are now, and for the rest of their lives will be, at a heightened and substantial risk of identity theft.  Plaintiffs have also incurred (and will continue to incur) damages in the form of, inter alia, loss of privacy and costs of engaging adequate credit monitoring and identity theft protection services.

119.    The cybercriminals who obtained the Class Members' PII may exploit the information they obtained by selling the data in so-called "dark markets" or on the "dark web." Having obtained these names, addresses, Social Security numbers, and other PII, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

- obtaining employment;

- obtaining a loan;

- applying for credit cards or spending money;

- filing false tax returns;

- stealing Social Security and other government benefits; and

- applying for a driver's license, birth certificate, or other public document.

120.    In addition, if a Class Member's Social Security number is used to create false

identification for someone who commits a crime, the Class Member may become entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

121.    As a direct and/or proximate result of Defendant's wrongful actions and/or inaction and the resulting Data Breach, Plaintiffs and the other Class Members have been deprived of the value of their PII, for which there is a well-established national and international market.

122.    Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for fraudulent misuse of this information to be detected.

123.    Accordingly, Defendant's wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiffs and the other Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.  Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach."  Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[48]  Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported.  Even data that have not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class Members' PII will do so at a later date or re-sell it.

124.    As a result of the Data Breach, Plaintiffs and Class Members have already suffered injuries, and each are at risk of a substantial and imminent risk of future identity theft.

125.    Yum! Brands admits that the ransomware attack "resulted in data being taken from

---

[48] *The Consumer Data Insecurity Report: Examining The Data Breach- Identity Fraud Paradigm In Four Major Metropolitan Areas*, *available at* https://www.it.northwestern.edu/bin/docs/TheConsumerDataInsecurityReport_byNCL.pdf   (last accessed Jan. 2, 2024).

our network." In other words, cybercriminals actually exfiltrated the Private Information that was accessed.[49]

### Data Breaches Put Individuals at an Increased Risk
### Of Fraud and Identify Theft

126.    Data Breaches such as the one experienced Plaintiffs and Class are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

127.    In 2019, the United States Government Accountability Office released a report addressing the steps individuals can take after a data breach. Its appendix of steps individuals should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the options. It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiffs and Class) must take after a breach like Defendant's are both time consuming and of only limited and short-term effectiveness.[50]

128.    The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record," discussing the same in a 2007 report as well ("2007 GAO Report").[51]

129.    The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if

---

[49] *See Yum! Brands Annual Report* at 13, *supra* note 3.
[50] https://www.gao.gov/assets/gao-19-230.pdf (last accessed January 2, 2024).
[51] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf   (last accessed January 2, 2024) ("2007 GAO Report").

someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[52]

130.   Theft of Private Information is also gravely serious. Private Information is a valuable property right.[53]

131.   It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report at p. 29.

132.   Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

133.   Cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as

---

[52] *See* https://www.identitytheft.gov/Steps (last accessed January 2, 2024).

[53] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

"Fullz" packages.[54]

134.    The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cybercriminals in the Data Breach, criminals can easily create a "Fullz" package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members.

135.    There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

136.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Personal Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but

---

[54] "Fullz" is fraudster-speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g*., Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs On Security, https://krebsonsecurity.com/tag/fullz/ (las accessed Feb. 5, 2024).

not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online, is encrypted, and is password-protected. Damages from a future breach due to Defendant's inadequate data security represent an irreparable injury (such as the further loss of privacy and exposure of PII such as social security numbers) for which no adequate remedy at law exists.

### Plaintiffs' Experiences

#### Plaintiff Christie Stinson

137. Plaintiff Stinson was formerly employed by Charter Foods, a franchisee of Yum! Brands. As a condition of receiving employment, Plaintiff Stinson was required to and provided her PII to Defendant which was then entered into Defendant's systems and maintained on its network.

138. Plaintiff Stinson greatly values her privacy and PII, especially when submitting information related to employment. Prior to the Data Breach, Plaintiff Stinson took reasonable steps to maintain the confidentiality of her PII including storing sensitive documents with PII in safe and secure locations, destroying sensitive documents, diligently selecting unique usernames and passwords on her various accounts. Plaintiff Stinson has not knowingly transmitted unencrypted PII over the internet or other unsecured medium. Plaintiff Stinson is unaware of ever having been a victim of a data breach prior to the Data Breach.

139. Plaintiff received a Notice letter dated April 7, 2023, from Defendant, or a subsidiary thereof, concerning the Data Breach. The letter states that unauthorized actors gained access to files on Defendant's network, which included Plaintiff's PII. The compromised files contained the name, address, date of birth, and/or social security number of Plaintiff Stinson that Defendant obtained in connection with its business operations.

140.    Recognizing the present, immediate, and substantial increased risk of harm that Plaintiff faces, Defendant offered her 12 months of identity theft protection services.

141.    Following the Breach and recognizing that each Class Member is now subject to the present and continuing risk of identity theft and fraud, Defendant sent to Plaintiff Stinson a Notice letter advising Plaintiff to "remain vigilant and consider taking steps to avoid identity theft" by reviewing your account information, changing passwords, and checking credit reports for suspicious activity.

142.    Since learning of the Data Breach, Plaintiff Stinson has heeded Defendant's advice and warnings and spent a significant number of hours mitigating the effects of the Data Breach, including verifying the legitimacy of the Notice of Data Breach, exploring credit monitoring and identity theft insurance options, and self-monitoring her accounts. Plaintiff Stinson spends approximately 30 hours a week monitoring her financial and sensitive accounts and dealing with the effects of the Data Breach.

143.    Plaintiff Stinson plans on taking additional time-consuming necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing bank, credit, and other accounts for unauthorized activity.

144.    Shortly after and as a result of the Data Breach, Plaintiff Stinson's mobile phones were hacked multiple times.

145.    Shortly after and as a result of the Data Breach, Plaintiff Stinson also noticed an increase in spam calls, text messages, and phishing emails. In January 2023, Plaintiff Stinson began receiving many spam calls and texts and emails per day. Finally, in February 2023, she grew weary of the spam and obtained a new telephone number.

146.    Plaintiff Stinson is concerned that the spam is being sent with the intent of obtaining

more personal information from her and committing identity theft by way of a social engineering attack.

147.    The Data Breach, and the resultant loss of privacy and exposure of her Social Security number, has caused Plaintiff Stinson to suffer fear, anxiety, and stress, which have been compounded by the fact that Yum! Brands has not been forthright about the cause of and full scope of the PII compromised in the Data Breach.

148.    Plaintiff Stinson has a continuing interest in ensuring that her PII, which upon information and belief, remains in Defendant's possession, is protected, and safeguarded from future breaches.

### *Plaintiff Haley Beasley*

149.    Plaintiff Haley Beasley is a former employee of Defendant. As a condition of receiving employment, Plaintiff Beasley was required to and provided her PII to Defendant which was then entered into Defendant's systems and maintained on its network.

150.    Plaintiff Beasley greatly values her privacy and PII, especially when submitting information related to employment. Prior to the Data Breach, Plaintiff took reasonable steps to maintain the confidentiality of her PII including storing sensitive documents with PII in safe and secure locations, destroying sensitive documents, diligently selecting unique usernames and passwords on her various accounts. Plaintiff Haley Beasley has not knowingly transmitted unencrypted PII over the internet or other unsecured medium.

151.    Plaintiff Beasley received a Notice letter dated April 14, 2023 from Defendant, or a subsidiary thereof, concerning the Data Breach. The letter states that unauthorized actors gained access to files on Defendant's network, which included Plaintiff Beasley's PII. The compromised files contained the Social Security number, name, and payroll information of Plaintiff Beasley that

Defendant obtained in connection with its business operations.

152.    Recognizing the present, immediate, and substantial increased risk of harm that Plaintiff faces, Defendant offered her 24 months of identity theft protection services.

153.    Shortly after and as a result of Yum! Brands' Data Breach, Plaintiff Haley Beasley has experienced a significant rise in spam communications, including paper mail, texts, calls, and emails. She is receiving 4-5 pieces of paper spam mail, 8-15 phone calls and/or texts, and 100+ spam emails daily.  She spends a significant portion of her time dealing with managing these communications, which interrupt her at work, and monitoring her accounts.

154.    Following the Breach and recognizing that each Class Member is now subject to the present and continuing risk of identity theft and fraud, Defendant sent to Plaintiff Beasley a Notice letter advising Plaintiff to "remain vigilant and consider taking steps to avoid identity theft" by reviewing your account information, changing passwords, and checking credit reports for suspicious activity.

155.    Since learning of the Data Breach, Plaintiff Beasley has heeded Defendant's advice and warnings and spent additional time mitigating the effects of the Data Breach, including changing her passwords, checking her credit reports for suspicious activity, and monitoring her accounts for fraud. Plaintiff estimates that she spends about 1-2 hours each week in the preceding activities.

156.    Plaintiff Beasley plans on taking additional time-consuming necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing bank, credit, and other accounts for unauthorized activity.

157.    The Data Breach has caused Plaintiff Haley Beasley to suffer fear, anxiety, and stress, and loss of sleep which have been compounded by the fact that Yum! Brands has not been

forthright about the cause of and full scope of the PII compromised in the Data Breach.

158.     Plaintiff Beasley has spent approximately 80 hours, in total, mitigating and dealing with the effects of the Data Breach.

159.     Plaintiff Beasley has a continuing interest in ensuring that her PII, which upon information and belief, remains in Defendant's possession, is protected, and safeguarded from future breaches.

*Plaintiff Demetra Doss*

160.     Plaintiff Demetra Doss is a former employee of Defendant, having first worked for Defendant in the summer of 2006 and most recently in mid- to late-2022. As a condition of receiving employment, Plaintiff was required to and provided her PII to Defendant which was then entered into Defendant's systems and maintained on its network.

161.     Plaintiff Doss greatly values her privacy and PII, especially when submitting information related to employment. Prior to the Data Breach, Plaintiff took reasonable steps to maintain the confidentiality of her PII, including storing sensitive documents with PII in safe and secure locations, destroying sensitive documents, and diligently selecting unique usernames and passwords on her various accounts. Plaintiff Doss has not knowingly transmitted unencrypted PII over the internet or other unsecured medium.

162.     Plaintiff Doss received a Notice letter dated April 21, 2023 from Defendant concerning the Data Breach. The letter states that unauthorized actors gained access to files on Defendant's network, which included Plaintiff Doss's PII. The compromised files contained the name and Social Security number of Plaintiff Doss that Defendant obtained in connection with its business operations.

163.     Recognizing the present, immediate, and substantial increased risk of harm that

Plaintiff Doss faces, Defendant offered her twenty-four (24) months of identity theft protection services.

164.    Since the Data Breach, Plaintiff Doss has been notified through her credit monitoring account with Experian that her PII, including Social Security number, is on the dark web.

165.    As a result of the Data Breach, Plaintiff Doss has been forced to change her account credentials and monitor her accounts at a much higher frequency than she did before.

166.    Following the Breach and recognizing that each Class Member is now subject to the present and continuing risk of identity theft and fraud, Defendant sent to Plaintiff Doss a Notice letter advising Plaintiff to "remain vigilant and consider taking steps to avoid identity theft" by reviewing your account information, changing passwords, and checking credit reports for suspicious activity.

167.    Since learning of the Data Breach, Plaintiff Doss has heeded Defendant's advice and warnings and spent additional time mitigating the effects of the Data Breach, including changing her passwords, checking her credit reports for suspicious activity, and monitoring her accounts for fraud. Plaintiff Doss estimates that she has spent roughly ten (10) to fifteen (15) hours in the preceding activities thus far, and will continue to spend at least an hour a week doing the same to help mitigate the harm caused by the Data Breach, including continually reviewing bank, credit, and other accounts for unauthorized activity.

168.    The Data Breach has caused Plaintiff Doss to suffer fear, anxiety, and stress, which have been compounded by the fact that Yum! Brands has not been forthright about the cause of and full scope of the PII compromised in the Data Breach.

169.    As set forth above, Plaintiff Doss has spent approximately ten (10) to fifteen (15)

hours, in total, mitigating and dealing with the effects of the Data Breach.

170.    Plaintiff has a continuing interest in ensuring that her PII, which upon information and belief, remains in Defendant's possession, is protected, and safeguarded from future breaches.

*Plaintiff Karen Ester*

171.    Plaintiff Ester has been an employee of Charter Foods North, LLC d/b/a Taco Bell in Erie, Pennsylvania, a subsidiary brand and franchise of Defendant Yum! Brands since September of 2022.

172.    As a material condition of her employment, Plaintiff Ester was required to provide her Personal Information to Yum! Brands, or to Charter Foods North, LLC d/b/a Taco Bell who provided this information to Defendant, including her full name, date of birth, address, contact information, Social Security Number, Driver's License Number and other NonDriver Identification Card Number. Plaintiff Ester provided her Personal Information directly or indirectly to Yum! Brands to work for its franchise, Charter Foods North, LLC d/b/a Taco Bell, to receive compensation for labor rendered.

173.    Plaintiff Ester received compensation from Charter Foods North, LLC d/b/a Taco Bell via direct deposit to her PNC bank account, at the account and routing number provided to Taco Bell and Yum! Brands.

174.    Plaintiff Ester received Defendant's and Charter Foods North, LLC d/b/a Taco Bell's Data Breach Notice dated April 7, 2023 on April 11, 2023, and became aware that her Personal Information was unauthorizedly disclosed and compromised in the Data Breach.

175.    Shortly after and as a direct result of her Personal Information being unauthorizedly disclosed by Defendant in the Data Breach, Plaintiff Ester has suffered severe identity fraud and fraudulent activity beginning in February 2023, including:

a. Four (4) different financial accounts being opened in her name, including Chime, a bank in India, and GO2bank;

b. Fraudulent withdraws from her PNC bank account in the sum of $700.00 on or about April 8th or 9th 2023, as well as additional overdraw fees in connection therewith;

c. Overdraws from the fraudulent Chime bank account; and

d. Fraudulent credit card applications, received in the mail.

176. Further, Plaintiff Ester has spent considerable time of six (6) weeks and effort attempting to remediate the harmful effects of these fraudulent charges, including being forced to close her PNC Bank account to prevent further fraudulent withdraws and damage, as well as time and effort to monitor her accounts to protect herself from additional identity theft.

177. The fraudulent charges resulting from Defendant's Data Breach have financially crippled Plaintiff, leaving Plaintiff Ester without any resources to purchase food and other necessities and causing her to go hungry for three (3) days.

178. Plaintiff Ester fears for her personal financial security and uncertainty over the fraudulent charges and devastating impact on her finances caused by the Data Breach. She is experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

179. Plaintiff Ester was highly disturbed by the Data Breach's nature and the thought of cybercriminals accessing her highly sensitive Personal Information and the harm caused by the Data Breach. She was also outraged that Yum! Brands took three (3) months to notify her of the Data Breach, without explaining its delay, considering the extreme harm caused by the Data

Breach.

180.    As a result of Yum! Brands' Data Breach, Plaintiff Ester faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed, like her date of birth and Social Security number. As such, the temporary, non-automatic credit monitoring and identity theft protection services offered by Defendant is insufficient to compensate her for the damages incurred and that will be incurred as a result of the Data Breach.

181.    In light of the foregoing fraudulent activity, it is obvious that Plaintiff Ester's Personal Information was disclosed to cybercriminals in the Data Breach and is now publicly available, including on the Dark Web, for sale and for criminal and fraudulent use, which will only result in additional injury and damages.

182.    Plaintiff Ester has a continuing interest in ensuring that her PII, which upon information and belief remains backed up and in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff John Farley*

183.    Plaintiff Farley was formerly employed by KFC Corporation, a subsidiary of Yum! Brands. In exchange for employment, Plaintiff Farley was required to provide the restaurant with his Private Information, including his Social Security number. Upon information and belief, KFC Corporation uses Yum! Brands' computer systems for human resource management and payroll.

184.    Around or after April 21, 2023, Plaintiff Farley received the "Notice of Security Breach" letter dated April 21, 2023, which indicated that Defendant had known about the Data Breach for about three months. The letter informed him that his PII was accessed during "a cybersecurity incident." The letter stated that the extracted information included his "name and social security number."

185.     Plaintiff Farley is alarmed by the fact that his Social Security number was identified as among the breach data that was accessed.

186.     Following the Breach and recognizing that each Class Member is now subject to the present and continuing risk of identity theft and fraud, Defendant sent to Plaintiff Farley a Notice letter advising Plaintiff to "remain vigilant and consider taking steps to avoid identity theft" by reviewing your account information, changing passwords, and checking credit reports for suspicious activity.

187.     Since learning of the Data Breach, Plaintiff Farley has heeded Defendant's advice and warnings and spent additional time mitigating the effects of the Data Breach, including verifying the legitimacy of the Notice of Data Breach, exploring credit monitoring and identity theft insurance options, and self-monitoring his accounts.

188.     Plaintiff Farley is very careful about sharing PII and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

189.     Plaintiff Farley suffered actual injury and damages as a result of the Data Breach. Plaintiff Farley would not have provided Defendant with his PII had Defendant disclosed that it lacked data security practices adequate to safeguard PII.

190.     Plaintiff Farley suffered actual injury in the form of damages and diminution in the value of his PII-a form of intangible property that he entrusted to KFC Corporation and Yum! Brands.

191.     Plaintiff Farley has already suffered lost time, annoyance, interference, loss of privacy and inconvenience as a result of the Data Breach and has anxiety, stress, and increased concerns for the loss of his privacy, especially his Social Security number.

192.     Plaintiff Farley reasonably believes that his Private Information may have already

been sold by the cybercriminals. Had he been notified of Defendant's breach in a more timely manner, he could have attempted to mitigate his injuries.

193.     Plaintiff Farley has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his stolen PII, especially his Social Security number, being placed in the hands of unauthorized third-parties and possibly criminals.

194.     Plaintiff Farley has a continuing interest in ensuring that his PII, which upon information and belief remains backed up and in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff David Knighten

195.     Plaintiff Knighten, a citizen of North Carolina, worked for Defendant prior to the Data Breach and received Defendant's Notice of Data Breach, in or around early April, 2023. The Notice stated that Plaintiff's personal information was impacted by the Data Breach.

196.     As a result of the Data Breach, Plaintiff Knighten's sensitive information was accessed and/or acquired by an unauthorized actor. The confidentiality of Plaintiff Knighten's sensitive information has been irreparably harmed. For the rest of his life, Plaintiff Knighten's will have to worry about when and how his sensitive information may be shared or used to his detriment.

197.     As a result of the Data Breach and at the recommendation of Defendant, Plaintiff Knighten spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts. This time has been lost forever and cannot be recaptured.

198.     Plaintiff Knighten is very careful about sharing his sensitive PII. He has never

knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

199.   Plaintiff Knighten stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

200.   Shortly after and as a result of the Data Breach, Plaintiff Knighten had an unknown address appear on his credit report. Plaintiff Knighten spent time disputing the existence of this address with the three major credit bureaus.

201.   Shortly after and as a result of the Data Breach, Plaintiff Knighten had a sum of money reported to the IRS as his earnings, despite Plaintiff Knighten never actually earning that sum of money. Plaintiff Knighten believes an unauthorized actor used his Social Security number following the Data Breach. Plaintiff Knighten spent time speaking with the IRS to dispute those earnings.

202.   Plaintiff Knighten suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and experiences fear, anxiety, and increased concerns for the loss of his privacy.

203.   As a result of the Data Breach, Plaintiff Knighten has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, being placed in the hands of unauthorized third parties and possibly criminals.

204.   Plaintiff Knighten has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

*Plaintiff William Sidler, Jr.*

205.    Plaintiff Sidler was formerly employed by Defendant. As a condition of receiving employment, Plaintiff was required to and provided (his/her) PII to Defendant which was then entered into Defendant's systems and maintained on its network.  Plaintiff Sidler was employed as a divisional training manager by Long John Silver's from approximately 1980 to 1997. In approximately 2002, Yum! Brands purchased Long John Silver's, and upon information and belief, assumed all of its collected personnel data as well as its responsibilities and liabilities regarding that data with its acquisition.

206.    Plaintiff Sidler greatly values his privacy and PII, especially when submitting information related to employment. Prior to the Data Breach, Plaintiff took reasonable steps to maintain the confidentiality of his PII including storing sensitive documents with PII in safe and secure locations, destroying sensitive documents, diligently selecting unique usernames and passwords on his various accounts. Plaintiff Sidler has not knowingly transmitted unencrypted PII over the internet or other unsecured medium. To his knowledge, he has not been the victim of a prior data breach before the one experienced by Yum! Brands.

207.    Plaintiff Sidler received a letter dated April 7, 2023, from Defendant concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Defendant's network and systems, which included Plaintiff's PII. The compromised files contained the name, address, date of birth, and/or social security number of Plaintiff Sidler that Defendant obtained in connection with its business operations.

208.    Recognizing the present, immediate, and substantial increased risk of harm that Plaintiff faces, Defendant offered him 12 months of identity theft protection services.

209.    Shortly after and as a result of the Data Breach, Plaintiff Sidler received an email from TD Bank on his old email address alerting him to fraudulent activities using his name and

Social Security number. Upon investigating that information, he discovered additional identity thefts that occurred: bank accounts were opened fraudulently in his name at TD Bank, Truist, Grow Credit Union, and a credit card was fraudulently obtained through Chime. He was forced to spend hours addressing each of these identity thefts.

210.     Shortly after and as a result of the Data Breach, Plaintiff Sidler has received a significant amount of spam calls and spam emails on his older email address each day. He has also been informed that his name, date of birth, Social Security number, email, and passwords have been found on the Dark Web.

211.     Plaintiff Sidler is concerned that the spam is being sent with the intent of obtaining more personal information from him and committing identity theft by way of a social engineering attack.

212.     Following the Breach and recognizing that each Class Member is now subject to the present and continuing risk of identity theft and fraud, Defendant sent to Plaintiff Sidler a Notice letter advising Plaintiff to "remain vigilant and consider taking steps to avoid identity theft" by reviewing your account information, changing passwords, and checking credit reports for suspicious activity.

213.     Since learning of the Data Breach, Plaintiff Sidler has heeded Defendant's advice and warnings and spent additional time mitigating the effects of the Data Breach, including monitoring his accounts for fraud. Plaintiff estimates that he spends about 14 hours each week in the preceding activities.

214.     Plaintiff Sidler plans on taking additional time-consuming necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing bank, credit, and other accounts for unauthorized activity.

215.    The Data Breach has caused Plaintiff Sidler to suffer fear, anxiety, and stress, which have been compounded by the fact that Yum! Brands has not been forthright about the cause of and full scope of the PII compromised in the Data Breach.  Plaintiff Sidler is alarmed by the fact that his Social Security number was identified as among the breach data that was breached. Of even more concern to him is that his Personal Information was stolen from Yum! Brands despite his not working for Long John Silver's or any other Yum! Brand for over 20 years.

216.    In response to the Data Breach, Plaintiff Sidler spends approximately 14 hours per week dealing with the consequences of the Data Breach, which will continue into the future. That loss of his time includes time spent verifying the legitimacy of the Notice of Data Breach, addressing the fraudulent bank accounts in his name, and self-monitoring his accounts in an effort to mitigate the damage caused by Yum! Brands' failures. Spending this time monitoring his accounts is specifically advised by Yum! Brands in its notice letters, such that it cannot reasonably assert that identity theft was not an imminent risk of its Data Breach.

217.    Plaintiff has a continuing interest in ensuring that his PII, which upon information and belief, remains in Defendant's possession, is protected, and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

218.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

219.    Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All individuals residing in the United States whose Private Information was maintained on Yum! Brands, Inc.'s computer systems and who were sent a notice of the January 2023 Data Breach.

220.    Excluded from the Class are Defendant's officers and directors and franchise owners, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

221.    Plaintiffs hereby reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

222.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Class consists of an undisclosed number of individuals whose data was compromised in Data Breach, which upon information and belief is numbered in the thousands of individuals.

223.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

        A.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

        B.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

        C.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

        D.    Whether Defendant's data security systems prior to and during the Data

Breach were consistent with industry standards;

E.   Whether Defendant owed a duty to Class Members to safeguard their Private Information;

F.   Whether Defendant breached its duty to Class Members to safeguard their Private Information;

G.   Whether computer hackers obtained Class Members' Private Information in the Data Breach;

H.   Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

I.   Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

J.   Whether Defendant's conduct was negligent;

K.   Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

L.   Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

224.   <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class member, was compromised in the Data Breach.

225.   <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class.   Plaintiffs' Counsel are competent and experienced in litigating Class actions.

226.   <u>Predominance</u>. Defendant has engaged in a common course of conduct toward

Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

227. <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

228. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

229. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

      A. Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise

due care in collecting, storing, and safeguarding their Private Information;

B.    Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

C.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

D.    Whether Defendant failed to take commercially reasonable steps to safeguard Private Information; and

E.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

230.    All members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Yum! Brands.

## CAUSES OF ACTION

### FIRST COUNT
**Negligence**
**(On behalf of Plaintiffs and All Class Members)**

231.    Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

232.    Defendant gathered and stored the Private Information of Plaintiffs and Class Members as part of the regular course of its business operations. Plaintiffs and Class Members were entirely dependent on Defendant to use reasonable measures to safeguard their Private Information and were vulnerable to the foreseeable harm described herein should Defendant fail to safeguard their Private Information.

233.     By collecting and storing this data in its computer property, and sharing it, and using it for commercial gain, Defendant assumed a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

234.     Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

235.     Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

236.     Defendant violated the FTC Act by failing to use reasonable measures to protect the Private Information of Plaintiffs and Class Members and by not complying with applicable industry standards, as described herein.

237.     Defendant breached its duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiffs' and Class Members' Private Information, and by failing to provide prompt notice without reasonable delay.

238.     Defendant's duty of care to use reasonable security measures arose as a result of

the special relationship that existed between Defendant and those who sought or were employed by it or its franchisees, which is recognized by laws and regulations including but not limited to FTCA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach or data breach.

239.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

240.    Defendant had full knowledge of the sensitivity of the Private Information, the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed, and the importance of adequate security.

241.    Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiffs and the Class members had no ability to protect their Private Information that was in Defendant's possession.

242.    Defendant was in a special relationship with Plaintiffs and Class Members with respect to the hacked information because the aim of Defendant's data security measures was to benefit Plaintiffs and Class Members by ensuring that their personal information would remain protected and secure. Only Defendant was in a position to ensure that its systems were sufficiently secure to protect Plaintiffs' and Class Members' Private Information. The harm to Plaintiffs and Class members from its exposure was highly foreseeable to Defendant.

243.    Defendant owed Plaintiffs and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing their Private Information, including taking action to

reasonably safeguard such data and providing notification to Plaintiffs and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

244.     Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See Restatement (Second) of Torts* § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

245.     Defendant had duties to protect and safeguard the Private Information of Plaintiffs and the Class from being vulnerable to compromise by taking common-sense precautions when dealing with sensitive Private Information. Additional duties that Defendant owed Plaintiffs and the Class include:

   a.     To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant' networks, systems, protocols, policies, procedures and practices to ensure that Plaintiffs' and Class members' Private Information was adequately secured from impermissible release, disclosure, and publication;

   b.     To protect Plaintiffs' and Class Members' Private Information in its possession by using reasonable and adequate security procedures and systems; and

   c.     To promptly and fully notify Plaintiffs and Class Members of any breach, security incident, unauthorized disclosure, or intrusion that affected or may have affected their Private Information.

246.     Only Defendant was in a position to ensure that its systems and protocols were sufficient to protect the Private Information that had been entrusted to them.

247.     Defendant breached its duties of care by failing to adequately protect Plaintiffs' and Class Members' Private Information. Defendant breached its duties by, among other things:

<ol type="a">
<li>Failing to exercise reasonable care in obtaining, retaining, securing, safeguarding, protecting, and deleting the Private Information in its possession;</li>

<li>Failing to protect the Private Information in its possession using reasonable and adequate security procedures and systems;</li>

<li>Failing to adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and store Private Information;</li>

<li>Failing to adequately train its employees to not store unencrypted Private Information in their personal files longer than absolutely necessary for the specific purpose that it was sent or received;</li>

<li>Failing to consistently enforce security policies aimed at protecting Plaintiffs' and Class Members' Private Information;</li>

<li>Failing to mitigate the harm caused to Plaintiffs and the Class Members;</li>

<li>Failing to implement processes to quickly detect data breaches, security incidents, or intrusions; and</li>

<li>Failing to promptly notify Plaintiffs and Class Members of the Data Breach that affected their Private Information.</li>
</ol>

248.     Defendant's willful failure to abide by these duties was wrongful, reckless, and

grossly negligent in light of the foreseeable risks and known threats.

249.    As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiffs and Class Members have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

250.    Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiffs and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiffs and Class Members while it was within Defendant's possession and control.

251.    Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiffs and Class Members, Defendant prevented Plaintiffs and Class Members from taking meaningful, proactive steps to securing their Private Information and mitigating damages.

252.    As a result of the Data Breach, Plaintiffs and Class Members have spent time, effort, and money to mitigate the actual and potential impact of the Data Breach on their lives, including but not limited to, responding to the fraudulent use of the Private Information, and closely reviewing and monitoring bank accounts, credit reports, and statements sent from providers and their insurance companies.

253.    Defendant's wrongful actions, inaction, and omissions constituted (and continue to constitute) common law negligence.

254.    The damages Plaintiffs and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

255.    Plaintiffs and the Class have suffered injury and are entitled to actual damages in amounts to be proven at trial.

**SECOND COUNT**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and All Class Members)**

256.    Plaintiffs re-allege and incorporate by the paragraphs above as if fully set forth herein.

257.    Plaintiffs and Class Members were required to provide their PII to Defendant as a condition of seeking or receiving employment or other services provided by Defendant.

258.    Plaintiffs and Class Members provided their PII to Defendant or its third-party agents in exchange for employment and the promise to protect Plaintiffs' and Class Members' PII from unauthorized disclosure.

259.    Implicit in the employment agreement between Defendant and its employees was the obligation that both parties would maintain information confidentially and securely.

260.    At all relevant times Defendant promulgated, adopted, and implemented written a Privacy Policy whereby it expressly promised Plaintiffs and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

261.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' Private Information would remain protected.

262.    Implicit in the agreement between Plaintiffs and Class Members and the Defendant to provide Private Information, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (e) reasonably safeguard and protect the Private Information of Plaintiffs and Class

Members from unauthorized disclosure or uses, and (f) retain the Private Information only under conditions that kept such information secure and confidential.

263.    When Plaintiffs and Class Members provided their Private Information to Defendant as a condition of an employment or service relationship, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

264.    Defendant required Class Members to provide their Private Information as part of Defendant's regular business practices.

265.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

266.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure. Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

267.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

268.    Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

269.    As a direct and proximate result of Defendant's breaches of the implied contracts, Class Members sustained damages as alleged herein.

270.    Plaintiffs and Class Members are entitled to compensatory and consequential

damages suffered as a result of the Data Breach.

271.     Plaintiffs and Class Members are alternatively entitled to nominal damages for the breach of implied contract.

272.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long term credit monitoring to all Class Members for a period longer than the grossly inadequate one- or two-years currently offered.

### THIRD COUNT
### Unjust Enrichment
### (On Behalf of Plaintiffs and All Class Members)

273.     Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

274.     This Count is pleaded in the alternative to the breach of implied contract count above.

275.     Plaintiffs and Class Members conferred a monetary benefit on Defendant in the form of the provision of their Private Information and Defendant would be unable to engage in its regular course of business without that Private Information.

276.     Defendant appreciated that a monetary benefit was being conferred upon it by Plaintiffs and Class Members and accepted that monetary benefit.

277.     However, acceptance of the benefit under the facts and circumstances outlined above make it inequitable for Defendant to retain that benefit without payment of the value thereof. Specifically, Defendant enriched itself by saving the costs it reasonably should have expended on

data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite data security.

278. Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures.

279. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

280. If Plaintiffs and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

281. Plaintiffs and Class Members have no adequate remedy at law.

282. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered or will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in

Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

283.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

284.     Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

## FOURTH COUNT
### Invasion of Privacy
### (On Behalf of Plaintiffs and All Class Members)

285.     Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

286.     Plaintiffs and Class Members had a legitimate expectation of privacy in their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

287.     Defendant owed a duty to its current, former, and prospective employees, including Plaintiffs and Class Members, to keep their PII confidential.

288.     Defendant failed to protect and released to unknown and unauthorized third parties the PII of Plaintiffs and Class Members.

289.     Defendant has acted with reckless disregard for the privacy of Plaintiffs and Class Members rising to the level of (1) an intentional intrusion by Defendant, (2) into a matter that

Plaintiffs and Class Members have a right to keep private (i.e., their PII), and (3) which is highly offensive to a reasonable person.

290.    Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because it had actual knowledge that its information security practices were inadequate and insufficient. For example, Defendant knew that PII was stored for years after Defendant no longer had a legitimate use for such data. Defendant also knew that the PII it stored was not securely encrypted, and that its systems were vulnerable to foreseeable threats as a result of inadequate security measures and training.

291.    As discussed in this Complaint, Defendant was aware of the potential of a data breach and failed to adequately safeguard its systems and implement appropriate policies to prevent the unauthorized release of Plaintiffs' and Class Members' data.

292.    Defendant acted with such reckless disregard as to the safety of Plaintiffs' and Class Members' PII to rise to the level of intentionally allowing the intrusion upon Plaintiffs' and Class Members' seclusion.

293.    The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiffs and the Class Members is highly offensive to a reasonable person.

294.    Plaintiffs and Class Members have been damaged by the invasion of their privacy in an amount to be determined at trial.

**FIFTH COUNT**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiffs and All Class Members)**

295.    Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

296.    Every contract in this State has an implied covenant of good faith and fair dealing,

which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

297.    Plaintiffs and Class Members have complied with and performed all conditions of their contracts with Defendant.

298.    Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard PII and financial information, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continued acceptance of PII and financial information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

299.    Defendant acted in bad faith and/or with malicious motive in denying Plaintiffs and Class Members the full benefit of their bargains as originally intended by the parties, thereby causing them injury in an amount to be determined at trial.

**SIXTH COUNT**
**Breach of Confidence**
**(On Behalf of Plaintiffs and All Class Members)**

300.    Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

301.    At all times during Plaintiffs and Class Members' interactions with Defendant, Defendant was fully aware of the confidential nature of the PII that Plaintiffs and Class Members provided to them.

302.    Defendant's relationship with Plaintiffs and the Class was governed by promises and expectations that Plaintiffs and Class Members' PII would be collected, stored and protected in confidence and would not be accessed by, acquired by, appropriated by, disclosed to,

encumbered by, exfiltrated by, released to, stolen by, used by and/or viewed by unauthorized third parties.

303.    Plaintiffs and Class Members provided their respective PII to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the PII to be accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by and/or viewed by unauthorized third parties.

304.    Plaintiffs and Class Members also provided their PII to Defendant with the explicit and implicit understanding that Defendant would take precautions to protect their PII from unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use and/or viewing, such as following basic principles of protecting their networks and data systems.

305.    Defendant voluntarily received, in confidence, Plaintiffs and Class Members' PII with the understanding that the PII would not be accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by and/or viewed by the public or any unauthorized third parties.

306.    Due to Defendant's failure to prevent, detect and avoid the Data Breach from occurring by, *inter alia,* not following best information security practices to secure Plaintiffs and Class Members' PII, Plaintiffs and Class Members' PII was accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by and/or viewed by unauthorized third parties beyond Plaintiffs and Class Members' confidence and without their express permission.

307.    As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and Class Members have suffered damages.

308.     But for Defendant's failure to maintain and protect Plaintiffs and Class Members' PII in violation of the parties' understanding of confidence, their PII would not have been accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by and/or viewed by unauthorized third parties. The Data Breach was the direct and legal cause of the misuse of Plaintiffs and Class Members' PII as well as the resulting damages.

309.     The injury and harm Plaintiffs and Class Members suffered and will continue to suffer was the reasonably foreseeable result of Defendant's unauthorized misuse of Plaintiffs and Class Members' PII. Defendant knew their data systems and protocols for accepting and securing Plaintiffs and Class Members' PII had security and other vulnerabilities that placed Plaintiffs and Class Members' PII in jeopardy.

310.     As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and Class Members have suffered and will continue to suffer injury, as alleged herein, including but not limited to (a) actual identity theft; (b) the compromise, publication and/or theft of their PII; (c) out-of-pocket expenses associated with the prevention, detection and recovery from identity theft and/or unauthorized use of their PII; (d) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft; (e) the continued risk to its PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Class Members' PII in its continued possession; (f) future costs in terms of time, effort and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; (g) the diminished value of Plaintiffs and Class Members' PII, and (h) the diminished value of

Defendant's services for which Plaintiffs and Class Members paid and received.

## SEVENTH COUNT
### Declaratory Judgment
### (On Behalf of Plaintiffs and All Class Members)

311.    Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

312.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

313.    An actual controversy has arisen in the wake of Defendant's data breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' Private Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class members from further data breaches that compromise their Private Information.

314.    Plaintiffs allege that Defendant's data security measures remain inadequate. Plaintiffs will continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

315.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

        a.    Yum! Brands continues to owe a legal duty to secure current and former employees' Private Information and to timely notify employees and former employees of a data breach under the common law, Section 5 of the FTC Act,

and various state statutes; and

b.    Yum! Brands continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiffs' and Class Members' Private Information.

316.    The Court also should issue corresponding prospective injunctive relief requiring that Yum! Brands employ adequate security protocols consistent with law and industry standards to protect Private Information.

317.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Yum! Brands. The risk of another such breach is real, immediate, and substantial. If another breach at Yum! Brands occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

318.    The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Yum! Brands if an injunction is issued. Among other things, if another massive data breach occurs at Yum! Brands, Plaintiffs and Class Members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Yum! Brands of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Yum! Brands has a pre-existing legal obligation to employ such measures.

319.    Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Yum! Brands, thus eliminating the additional injuries that would result to Plaintiffs and the

millions of individuals whose Private Information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.   For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class;

B.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures of its Data Breach to Plaintiffs and Class Members;

C.   For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to PII collection, storage, and safety, and to disclose with specificity the types of Private Information compromised during the Data Breach;

D.   For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.   For declaratory relief as requested;

F.   Ordering Defendant to pay for lifetime credit monitoring services for Plaintiffs and the Class;

G.   For an award of actual damages, nominal damages, compensatory damages, and statutory damages, in an amount to be determined, as allowable by law;

H.   For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

I.   Pre- and post-judgment interest on any amounts awarded; and

J.     Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: February 20, 2024                    Respectfully submitted,

                                            /s/ Gary E. Mason
                                            Gary E. Mason*
                                            Danielle L. Perry*
                                            Lisa A. White*
                                            MASON LLP
                                            5335 Wisconsin Avenue NW, Suite 640
                                            Washington, DC 20015
                                            Tel: (202) 429-2290
                                            Email: gmason@masonllp.com
                                            Email: dperry@masonllp.com
                                            Email: lwhite@masonllp.com

                                            Alexander Edmondson (KY Bar # 88406)
                                            EDMONDSON & ASSOCIATES LAW
                                            28th West 5th
                                            Covington, Kentucky 41011
                                            Tel: (859) 491-4100
                                            Email: aedmondson@edmondsonlaw.com

                                            Terence R. Coates*
                                            Dylan J. Gould*
                                            Jonathan T. Deters*
                                            MARKOVITS, STOCK & DEMARCO, LLC
                                            119 E. Court Street, Suite 530
                                            Cincinnati, OH 45202
                                            Tel: (513) 651-3700
                                            Fax: (513) 665-0219
                                            Email: tcoates@msdlegal.com
                                            Email: dgould@msdlegal.com
                                            Email: jdeters@msdlegal.com

                                            Gary M. Klinger*
                                            MILBERG COLEMAN BRYSON
                                            PHILLIPS GROSSMAN, PLLC
                                            227 W. Monroe Street, Suite 2100
                                            Chicago, IL 60606
                                            Tel: 866-252-0878
                                            Email: gklinger@milberg.com

Paul J. Doolittle (*Pro Hac Vice Pending*)
**POULIN | WILLEY |**
**ANASTOPOULO, LLC**
32 Ann Street
Charleston, SC 29403
Tel: (803) 222-2222
Email: pauld@akimlawfirm.com

*Counsel for Plaintiffs*

*admitted *pro hac vice*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on February 20, 2024, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>*/s/ Gary E. Mason*</u>
Gary E. Mason