UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CHRISTIE STINSON et al.,

Plaintiffs,

v.                                                           Civil Action No. 3:23-cv-183-DJH-LLK

YUM! BRANDS, INC.,

Defendant.

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiffs Haley Beasley, Demetra Doss, John Farley, and William Sidler, Jr. filed this purported class action against Defendant Yum! Brands, Inc. arising from a data breach suffered by Yum that exposed Plaintiffs' personally identifiable information (PII). (Docket No. 1; D.N. 42) Specifically, Plaintiffs assert Kentucky-law claims of negligence, breach of implied contract, unjust enrichment, invasion of privacy, breach of the implied covenant of good faith and fair dealing, and breach of confidence, as well as a claim for a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 201 et seq.[1] (D.N. 42, PageID.342–59 ¶¶ 231–319) Yum moves to dismiss Plaintiffs' second amended complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of standing and Rule 12(b)(6) for failure to state a claim. (D.N. 51) Yum also moves to compel arbitration of Beasley and Doss's claims pursuant to arbitration clauses in Beasley and Doss's employment agreements. (D.N. 52) Finally, Yum moves to strike the

_____

[1] Plaintiffs purport to represent a class of "[a]ll individuals residing in the United States whose Private Information was maintained on Yum! Brands, Inc.'s computer systems and who were sent a notice of the January 2023 Data Breach." (Docket No. 42, PageID.338 ¶ 219) Plaintiffs' second amended complaint included additional named plaintiffs Christie Stinson, Karen Ester, and David Knighten. (*Id.*, PageID.293) Stinson, Ester, and Knighten were not sent a notice of the January 2023 Data Breach (D.N. 51, PageID.806 (citing D.N 42, PageID.324 ¶ 137; PageID.330 ¶ 171; PageID.334 ¶ 195)) and have voluntarily dismissed their claims. (D.N. 65; D.N. 72; D.N. 79)

nationwide class allegations in Plaintiffs' second amended complaint based on "variations in the applicable state laws," which, according to Yum, "would preclude Plaintiffs from obtaining class certification pursuant to Federal Rule of Civil Procedure 23." (D.N. 53, PageID.836) Plaintiffs oppose Yum's motions. (D.N. 81; D.N. 82; D.N. 83) After careful consideration, the Court will grant in part and deny in part Yum's motion to dismiss, grant in part and deny in part Yum's motion to compel arbitration, and deny Yum's motion to strike for the reasons set out below.

## I.  BACKGROUND

### A.  Yum's Business and Security Practices

"[W]here a defendant argues that . . . plaintiff[s] ha[ve] not alleged sufficient facts in [their] complaint to create subject matter jurisdiction, the trial court takes the allegations in the complaint as true." *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003) (citation omitted). Similarly, when reviewing a motion under Rule 12(b)(6), the Court "take[s] the facts only from the complaint, accepting them as true." *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 757 (6th Cir. 2020). Yum is "the world's largest restaurant company" and oversees "approximately 1,500 franchisees operating more than 55,000 restaurants in over 155 countries and territories." (D.N. 42, PageID.298 ¶ 29) Yum and its franchisees "collect and maintain the [personally identifiable information] of current and former employees and applicants for jobs[] as a requirement of its business practices." (*Id.*, PageID.299 ¶ 31) As of December 21, 2022, Yum and its subsidiaries "employed approximately 23,000 employees in the United States," all of whom were required to divulge PII as a condition of their employment. (*See id.* ¶¶ 30–31; *id.*, PageID.301 ¶¶ 39–41) Specifically, employees and job applicants are required to divulge their first and last names, home addresses, dates of birth, financial information, photo identification and/or driver's licenses, email addresses, phone numbers, and Social Security numbers. (*Id.*, PageID.301 ¶ 39)

Plaintiffs are former job applicants and employees of Yum and, as a result, their PII was "entered into [Yum's] systems and maintained on its network." (*Id.*, PageID.324–38 ¶¶ 137–217) Plaintiffs "provided [Yum] with PII with the mutual understanding that this highly sensitive private information was confidential and would be properly safeguarded from misuse and theft." (*Id.*, PageID.300 ¶ 34) Yum, in turn, "promised to provide confidentiality and adequate security . . . in compliance with the statutory privacy requirements applicable to its industry." (*Id.* ¶ 35) Nevertheless, Yum allegedly failed "to employ reasonable and appropriate measures to protect against unauthorized access to" Plaintiffs' PII. (*Id.*, PageID.318 ¶ 115) In particular, Plaintiffs claim that Yum fails to "follow its own policies or industry standard practices in securing . . . employee[s'] PII," "ensure proper monitoring and logging of the ingress and egress of network traffic," "ensure the proper implementation of sufficient processes to quickly detect and respond to data breaches," "ensure the proper encryption of . . . PII," and properly "train[] its employees and cybersecurity partners on cybersecurity policies." (*Id.*, PageID.303 ¶¶ 48–54) Moreover, Plaintiffs allege that Yum does not follow "commonly accepted" security standards such as "maintaining a secure firewall configuration" and "monitoring for suspicious . . . traffic." (*Id.*, PageID.311 ¶ 90) Finally, Plaintiffs assert that Yum's data-security policies and procedures "fail[] to comply with FTC guidelines." (*Id.*, PageID.315–18)

## B.    The Data Breach

On January 13, 2023, Yum "experienced a cybersecurity incident involving unauthorized access to certain of [Yum's] systems." (*Id.*, PageID.304 ¶ 57 (internal quotation omitted)) The cybersecurity incident, "a ransomware attack," "temporarily disrupted certain of [Yum's] affected systems and resulted in data being taken from [Yum's] network." (*Id.* ¶ 58 (internal quotation and emphasis omitted)) The data breach compromised Plaintiffs' "names, addresses, dates of birth,

and/or Social Security numbers."[2]  (*Id.*, PageID.304 ¶ 60)  Yum did not notify Plaintiffs of the breach until April 7, 2023, approximately three months after it occurred.  (*Id.*, PageID.304–05 ¶ 61)  Following the data breach, Yum offered Beasley, Doss, and Sidler at least one year of identity-theft protection services.  (*Id.*, PageID.327 ¶ 152; *id.*, PageID.328–29 ¶ 163; *id.*, PageID.336 ¶ 208)  In addition, Yum now encourages individuals affected by the data breach "to enroll in credit monitoring, fraud consultation, and identity theft restoration services."  (*Id.*, PageID.305 ¶ 66)

Plaintiffs allege an imminent risk of identity theft because "a data breach increases the risk of becoming a victim of identity theft."  (*Id.*, PageID.307 ¶ 76)  This risk is heightened because the breach involved Plaintiffs' Social Security numbers, which are "the key to stealing any person's identity" (*id.*, PageID.308 ¶ 77) and "may be put to a variety of fraudulent uses and are difficult for an individual to change."  (*Id.*, PageID.312–13 ¶ 95)  Moreover, Plaintiffs allege, the risk of identity theft is even more severe here because the data breach "was perpetrated by a financially motivated, Russian-speaking group of cybercriminals known as LockBit" who conduct attacks involving "additional malicious actors and affiliates who are willing to pay for its services." (*Id.*, PageID.306 ¶ 67)  According to Plaintiffs, they "reasonably believe their stolen [PII] is currently available for sale on the Dark Web because that is the *modus operandi* of cybercriminals who target businesses that collect highly sensitive [PII]."  (*Id.*, PageID.305 ¶ 65)  Plaintiffs further allege that cybercriminals like LockBit "can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete

---

[2] Each named Plaintiff had different PII stolen due to the data breach.  Beasley's "Social Security number, name, and payroll information" were stolen.  (D.N. 42, PageID.326 ¶ 151)  Doss and Farley had their "name[s] and Social Security number[s]" compromised.  (*Id.*, PageID.328 ¶ 162; *id.*, PageID.332 ¶ 184)  Sidler's "name, address, date of birth, and/or Social Security number" were exposed.  (*Id.*, PageID.336 ¶ 207)

scope and degree of accuracy in order to assemble complete dossiers on individuals." (*Id.*, PageId.322 ¶ 133)  These dossiers, known as "Fullz packages" (*id.*), allow cybercriminals to reap substantial profits from Plaintiffs' PII "even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cybercriminals in the Data Breach." (*Id.*, PageID.323 ¶ 134)

Plaintiffs also allege additional injuries.  First, Plaintiffs allege a "loss of privacy" due to the unauthorized dissemination of their PII on the internet.  (*See, e.g.*, *id.*, PageID.319 ¶ 118) Second, Plaintiffs "have been deprived of the value of their PII, for which there is a well-established national and international market." (*Id.*, PageID.320 ¶ 121; *see also id.*, PageID.312 ¶ 93)  Third, Plaintiffs have "experienced a significant rise in spam communications, including paper mail, texts, calls, and emails" since the data breach.  (*Id.*, PageID.327 ¶ 153; *see also id.*, PageID.337 ¶ 210; *id.*, PageID.325 ¶ 145)  Fourth, Plaintiffs spend one to fourteen hours per week responding to the negative effects of the data breach.  (*See, e.g.*, *id.*, PageID.338 ¶ 216; *id.*, PageID.327 ¶ 155)  Fifth, Plaintiffs have incurred mitigation costs.  (*Id.*, PageID.319 ¶ 118) Finally, Plaintiffs have suffered "fear, anxiety, . . . stress, and loss of sleep." (*See, e.g.*, *id.*, PageID.327 ¶ 157)  Some named Plaintiffs also allege more individualized harms.  Sidler, for example, alleges that his PII has been found on the dark web since the data breach (*id.*, PageID.337 ¶ 210), and that he "received an email from TD Bank . . . alerting him to fraudulent activities using his name and Social Security number" as a result.  (*Id.*, PageID.336–37 ¶ 209)  Sidler then "discovered additional identity thefts that occurred" including "bank accounts . . . opened fraudulently in his name at TD Bank, Truist, [and] Grow Credit Union" and "a credit card . . . fraudulently obtained through Chime." (*Id.*)

### C.    The Current Action

Stinson filed this action on behalf of herself and similarly situated parties on April 14, 2023.  (D.N. 1)  Stinson then moved to consolidate the case with four related actions brought by other individuals (D.N. 19), and the Court granted the motion to consolidate on January 19, 2024. (D.N. 36)  After Plaintiffs filed two amended complaints (D.N. 35; D.N. 42), Stinson, Ester, and Knighten voluntarily dismissed their claims.  (D.N. 65; D.N. 72; D.N. 79)  Now, Yum moves to dismiss Plaintiffs' second amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (D.N. 51), to compel arbitration as to Beasley and Doss (D.N. 52), and to strike the second amended complaint's nationwide class allegations.  (D.N. 53)  Plaintiffs oppose each motion.  (D.N. 81; D.N. 82; D.N. 83)  On May 9, 2025, the Court held oral argument on Yum's motions.  (D.N. 121)  At the conclusion of the hearing, the Court took the matters under advisement.  (*See id.*)

## II.    ANALYSIS

### A.    Rule 12(b)(1)

Yum argues that Plaintiffs lack standing.  (D.N. 51, PageID.807)  "'Standing is a threshold issue for bringing a claim in federal court'" and therefore must be decided "at the outset."  *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 750 (6th Cir. 2023) (quoting *Moody v. Mich. Gaming Control Bd.*, 847 F.3d 399, 402 (6th Cir. 2017)).  Indeed, "without standing, a federal court has no jurisdiction to hear the case."  *Id.*  "[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element [of standing]."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  Specifically, Plaintiffs must allege facts demonstrating that (1) they have suffered an "injury in fact"; (2) the injury is fairly traceable to Yum's actions; and (3) the injury is likely to be redressed

by a favorable decision. *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 581 (6th Cir. 2016) (citing *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 606–07 (6th Cir. 2007)).

A defendant may present a facial or factual challenge to subject-matter jurisdiction under Federal Rule Civil Procedure 12(b)(1). *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012) (internal quotations omitted). When the defendant makes a facial challenge, "all of the allegations in the complaint must be taken as true." *Id.* A factual challenge, on the other hand, requires the Court to "actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction." *Id.* (citations omitted). Here, Yum asserts only a facial challenge, and the Court will therefore presume that the second amended complaint's allegations are true.[3] (D.N. 51, PageID.807–16)

### 1.    Injury in Fact—Imminence

An injury in fact is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). To satisfy the imminence requirement, Plaintiffs "can show *either* that [they] ha[ve] already sustained an injury or [are] in immediate danger of sustaining an injury." *Savidge v. Pharm-Save, Inc.*, 727 F. Supp. 3d 661, 676 (W.D. Ky. 2024) (citation omitted). When a plaintiff attempts to satisfy the injury-in-fact requirement based on a risk of future harm, the "threatened injury must be *certainly impending*"; "[a]llegations of *possible* future injury are not sufficient." *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409

---

[3] Yum has raised a factual challenge to Stinson, Knighten, and Ester's alleged injuries. (D.N. 51, PageID.808–09) But as noted above, Stinson, Knighten, and Ester have voluntarily dismissed their claims. (D.N. 65; D.N. 72; D.N. 79) Thus, Yum's factual attack is moot, and the Court need not consider it.

(2013)).  The Supreme Court has, however, "found standing based on a substantial risk that the harm will occur, [prompting] plaintiffs to reasonably incur costs to mitigate or avoid that harm, even where it is not literally certain the harms they identify will come about." *Id.* (quoting *Clapper*, 568 U.S. at 414 n.5) (internal quotations omitted).  Still, plaintiffs "cannot manufacture standing by incurring costs in anticipation of non-imminent harm." *Clapper*, 568 U.S. at 422.

In *Galaria*, the Sixth Circuit considered "allegations of a substantial risk of harm, coupled with reasonably incurred mitigation costs," as a basis for standing in the data-breach context.  663 F. App'x at 388.  There, the plaintiffs alleged that "the theft of their personal data place[d] them at a continuing, increased risk of fraud and identity theft." *Id.*  In finding a sufficiently imminent harm, the Sixth Circuit stressed that the plaintiffs had "allege[d] that their data ha[d] already been stolen and [was] now in the hands of ill-intentioned criminals." *Id.*  The court explained that "it would be unreasonable to expect [p]laintiffs to wait for actual misuse . . . before taking steps to ensure their own personal and financial security, particularly when [the defendant] recommended taking [such] steps." *Id.*  The Sixth Circuit also noted that the defendant "seem[ed] to recognize the severity of the risk, given its offer to provide credit-monitoring and identity-theft protection" services to the plaintiffs. *Id.*

But *Galaria* was decided before the Supreme Court further articulated what "risk[s] of future harm [can] support Article III standing" in *TransUnion LLC v. Ramirez*, 594 U.S. 413, 438 (2021).  *TransUnion* stressed that when a plaintiff relies on the risk of future harm to establish standing, "the future harm must be sufficiently likely to occur." *Savidge*, 727 F. Supp. 3d at 681 (citing *TransUnion*, 594 U.S. at 437–38).  In *Savidge*, this Court reviewed post-*TransUnion* authority and explained that

to determine whether an injury is imminent in a data breach suit, circuit courts have relied on the following non-exhaustive list of factors: whether the breach was

intentional; whether the data was misused; and whether the nature of the information accessed through the data breach could subject a plaintiff to a risk of identity theft.

*Id.* at 683 (internal quotation and citations omitted).  "To be clear, this list is non-exhaustive," and "no single factor is dispositive."  *Id.*  As to the first factor, imminence is more likely where "the individuals who obtained the PII (i.e., the cybercriminals) acted intentionally."  *Id.* at 685 (citation omitted).  The second factor recognizes "that past misuse makes it more likely that the stolen data will be misused in the future" and therefore weighs in favor of imminence where "at least some of the stolen data has been misused" by cybercriminals.  *Id.* at 687.  Finally, as to the third factor, the exposure of a plaintiff's "name, address, and Social Security number" or other "highly sensitive personal information" supports imminence because such information is "more likely to create a risk of identity theft or fraud."  *Id.* at 688 (internal quotation and citations omitted).

Yum argues that the risk of future identity theft is insufficiently imminent to establish Article III standing for Beasley, Doss, and Farley's claims.[4]  (D.N. 51, PageID.809–12)  In doing so, Yum attempts to distinguish the present case from *Galaria*.  (*Id.*, PageID.810–11)  According to Yum, *Galaria* merely "stands for the simple principle that an inference in favor of finding standing can be drawn from an attacker's apparent intent to steal data."  (*Id.*, PageID.811)  Yum notes that *Galaria* dealt with a situation where "plaintiffs filed their complaint four months after the data breach."  (*Id.*)  Here, on the other hand, more than "15 months have passed" since the data breach, yet Beasley, Doss, and Farley "do not allege that their identities have been stolen" or that they otherwise suffered PII misuse.  (*Id.*, PageID.810; *see also* D.N. 89, PageID.986)  Essentially, Yum argues that "the failure of the threatened harm to actually occur over [this] long period of time . . . clearly defeats" the purported *Galaria* inference.  (D.N. 51, PageID.811)

---

[4] Yum does not dispute the imminence of Sidler's alleged injuries.  (*See generally* D.N. 51)

As an initial matter, the Court disagrees with Yum's argument regarding the passage of time without PII misuse following Plaintiffs' complaint. The Court "must determine whether standing exists at the time of the filing of the complaint only." *Graveline v. Benson*, 992 F.3d 524, 532 (6th Cir. 2021) (citations omitted); *see Patton v. Fitzhugh*, 131 F.4th 383, 392 (6th Cir. 2025) (explaining that "when a plaintiff has filed an amended complaint, standing is measured by when the plaintiff initiated the suit, but as explained by allegations in the operative complaint"). As such, the relevant inquiry is whether Plaintiffs' injuries were sufficiently imminent as of April 14, 2023, when the original complaint was filed. (D.N. 1) Plaintiffs allege that some named Plaintiffs were not notified of the breach until "April 21, 2023," (D.N. 42, PageID.333 ¶ 184 (Farley); *id.*, PageID.328 ¶ 162 (Doss)), while others were notified on "April 7, 2023" (*id.*, PageID.336 ¶ 207 (Sidler) and on "April 14, 2023." (*Id.*, PageID.326 ¶ 151 (Beasley)) Yum does not argue that the risk of identity theft was speculative as of April 14, 2023—nor could it, given that Yum offered several of the named Plaintiffs at least one year of identity-theft protection service. (*See, e.g., id.*, PageID.327 ¶ 152 (Beasley); *id.*, PageID.336 ¶ 208 (Sidler); *id.*, PageID.328–29 ¶ 163 (Doss)) Indeed, Yum's provision of these services to Plaintiffs is highly relevant to the imminence analysis. *See Savidge*, 727 F. Supp. 3d at 690 ("Thus, the plaintiffs here must demonstrate standing at the time the suit was filed, in 2017, roughly a year after the breach. But Pharm-Save does not argue that the risk of future harm was speculative at that time, nor would any such argument be supported by the case law . . . . Indeed, Pharm-Save offered credit monitoring services for two years following the breach.").

The Court concludes that the risk of future identity theft is sufficiently imminent as to Beasley, Doss, and Farley. Yum does not contest that "the breach was intentional," *Savidge*, 727 F. Supp. 3d at 683–86, and therefore the first *Savidge* factor supports imminence. *See id.* As to

the second factor, Plaintiffs' second amended complaint sufficiently alleges that "at least some of the stolen data has been misused" by cybercriminals, *id.* at 687: Plaintiffs allege that Sidler was notified of "fraudulent activities using his name and Social Security number" shortly after the data breach, including multiple bank accounts fraudulently opened in his name and a credit card fraudulently obtained through Chime.  (D.N. 42, PageID.337 ¶ 209)  Therefore, Plaintiffs have adequately alleged that it is "more likely that the stolen data will be misused in the future." *Savidge*, 727 F. Supp. 3d at 687.   And like the defendant in *Galaria*, Yum has implicitly "recognized the severity of the risk, given its offer to provide credit-monitoring and identity-theft protection" services to Plaintiffs.  663 F. App'x at 388.  Indeed, Yum provided Plaintiffs with identity-theft protection services for extended periods of time, which further reflects Yum's tacit understanding that the risk of identity theft would persist for many months or even years.  (*See, e.g.*, D.N. 42, PageID.327 ¶ 152 (alleging that Yum offered Beasley 24 months of identity-theft protection services))

The final factor, "whether the nature of the information accessed through the data breach could subject a plaintiff to a risk of identity theft," also weighs in Plaintiffs' favor.  *See Savidge*, 727 F. Supp. 3d at 688 (quotation omitted).  Plaintiffs allege that the data breach compromised their "names, addresses, dates of birth, and/or Social Security numbers."  (D.N. 42, PageID.304 ¶ 60)  And although there are minor variations in the type of PII allegedly stolen for each named Plaintiff, each named Plaintiff alleges that they had their Social Security number and name stolen. (*See id.*, PageID.326 ¶ 151 (Beasley); *id.*, PageID.328 ¶ 162 (Doss); *id.*, PageID.332 ¶ 184 (Farley); *id.*, PageID.336 ¶ 207 (Sidler))  *Savidge* specifically identified names and Social Security numbers as "more likely to create a risk of identity theft or fraud," and therefore the theft of this

"highly sensitive personal information" bolsters the imminence of the risks identified by Plaintiffs here. *See Savidge*, 727 F. Supp. 3d at 688 (quotations and citations omitted).

In sum, Plaintiffs have alleged a sufficiently imminent risk of future harm for Article III standing purposes. *See id.* at 683–90; *see also Haney v. Charter Foods N., LLC*, 747 F. Supp. 3d 1093, 1104–06 (E.D. Tenn. 2024).

### 2.    Injury in Fact—Concreteness

As noted above, an injury in fact must also be "concrete." *Spokeo*, 578 U.S. at 339 (quotation omitted).  In *TransUnion*, the Supreme Court explained that in a suit for damages, "the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a *separate* concrete harm." *TransUnion*, 594 U.S. at 436 (citation omitted).  Thus, the imminent risk of identity theft discussed above cannot establish a sufficiently concrete harm unless "exposure to the risk of future harm itself causes a separate concrete harm."[5] *Id.*  Recognizing this principle, Plaintiffs "do not allege that the risk of harm—standing alone—is sufficient" to confer standing for their claims.  (D.N. 82, PageID.923)  Instead, Plaintiffs contend that they "face a substantial risk of imminent harm, which has caused them to suffer independent cognizable injuries," including mitigation costs and loss of privacy.  (*Id.*)

---

[5] The concreteness requirement has also been explained as requiring, in a suit for damages, that "the risk of future harm materialized . . . or the exposure to that risk caused some other injury," such as mitigation costs.  *Savidge*, 727 F. Supp. 3d at 682 (citations and internal quotations omitted).  There appears to be a circuit split as to whether plaintiffs "must demonstrate a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts *and* some other injury, or whether these are alternative means of satisfying concreteness." *Id.* at 682 n.10 (emphasis added).  The Sixth Circuit has not clearly resolved this issue.  *See id.*  In any event, as discussed below, Plaintiffs have satisfied the "close relationship" analysis.  Moreover, Plaintiffs have articulated "some other injury," namely mitigation costs.  (*See, e.g.*, D.N. 42, PageID.319 ¶ 118)  Thus, Plaintiffs have satisfied both inquires, and the Court need not analyze this discrete issue further.  *See Savidge*, 727 F. Supp. 3d at 682, 690–93.

An intangible harm (like the loss of privacy) can be concrete so long as "the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (quoting *Spokeo*, 578 U.S. at 341). In other words, when determining whether an intangible harm is sufficiently concrete to support Article III standing, the Court "asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* Plaintiffs need not present "an exact duplicate in American history and tradition" to allege a concrete intangible harm. *Id.*

Although the Sixth Circuit has not clearly determined applicable "historical or common-law analogue[s]," *id.*, in the data-breach context, other circuits have done so. *See Savidge*, 727 F. Supp. 3d at 690–92 (collecting cases). The Second Circuit, for example, has concluded that "the exposure of [a] plaintiff's private PII to unauthorized third parties[] 'bears some relationship to [the] well-established common-law analog[ue of] public disclosure of private facts.'" *Id.* at 691 (quoting *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276, 285 (2d Cir. 2023)). The Second Circuit had "no trouble" reaching this conclusion because *TransUnion* "specifically recognized that 'disclosure of private information' was an intangible harm 'traditionally recognized as providing a basis for lawsuits in American courts.'" *Bohnak*, 79 F.4th at 285–86 (quoting *TransUnion*, 594 U.S. at 425). Similarly, the Third Circuit has explained that "if the theory of injury is an unauthorized exposure of personally identifying information that results in an increased risk of identity theft or fraud, that harm is closely related to that contemplated by privacy torts that are well-ensconced in the fabric of American law." *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 155 (3d Cir. 2022).

Notwithstanding this authority, Yum contends that Beasley, Doss, and Farley cannot rely on disclosure of private facts to satisfy the concreteness requirement because they have not alleged

the requisite elements of that tort. (D.N. 51, PageID.815) In support, Yum cites a footnote in *TransUnion* for the proposition that a plaintiff's alleged injury cannot "circumvent[] a fundamental requirement of an ordinary [tort] claim." (D.N. 89, PageID.982 (citing *TransUnion*, 594 U.S. at 434 n.6)) Yum notes that the tort of disclosure of private facts traditionally "imposes liability for 'publici[zing]' 'a matter concerning the private life of another,' if that matter is of a kind that 'would be highly offensive to a reasonable person' and 'not of legitimate public concern.'" (*Id.*, PageID.814 (quoting *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1245 (11th Cir. 2022))) But according to Yum, Plaintiffs "do not allege that Yum[] intentionally published their information" (*id.*), and more generally "do not make any factual allegations about the purported publication of their PII." (D.N. 89, PageID.982) As a result, Yum asserts, Plaintiffs cannot demonstrate a close relationship between their claims and the tort of public disclosure of facts and thus lack a concrete injury. (*Id.*, PageID.983)

Yum's argument fails. Plaintiffs allege that they have been injured by the exposure of their private and highly sensitive PII to cybercriminals and other unauthorized third parties on the dark web. (*See, e.g.*, D.N. 82, PageID.917) Multiple courts in this circuit and across the country have concluded that such an injury is sufficiently concrete given its close relationship to the tort of public disclosure of private facts. *See, e.g.*, *Savidge*, 727 F. Supp. 3d at 692; *Bohnak*, 79 F.4th at 287; *Clemens*, 48 F.4th at 157–58. Moreover, Plaintiffs have sufficiently alleged publication: they allege that their PII is now openly accessible on the dark web.[6] (*See, e.g.*, D.N. 42, PageID.305

---

[6] Yum cites *Marlin v. Associated Materials, LLC*, but that case is distinguishable. (D.N. 89, PageID.983) There, the plaintiff had only alleged "access by a single, unauthorized third party, not widespread disclosure." *Marlin v. Associated Materials, LLC*, No. 5:23CV1621, 2024 WL 2319115, at *3 (N.D. Ohio May 22, 2024). Here, by contrast, Plaintiffs have alleged that their PII is openly accessible on the dark web because of the data breach. (*See, e.g.*, D.N. 42, PageID.305 ¶¶ 65–66; *id.*, PageID.329 ¶ 164)

¶¶ 65–66; *id.*, PageID.329 ¶ 164)  Although this assertion may not exactly mirror the allegations necessary to state a common-law claim for public disclosure of private facts, plaintiffs need not present "an exact duplicate" of a traditionally recognized tort to allege a concrete harm. *TransUnion*, 594 U.S. at 424.  For the same reason, Plaintiffs' allegations regarding intentionality—that Yum "acted with such reckless disregard as to the Safety of Plaintiffs' and Class Members' PII to rise to the level of intentionally allowing the intrusion" (D.N. 42, PageID.353 ¶ 292; *see also id.*, PageID.303 ¶¶ 48–54 (alleging that Yum systematically failed to follow adequate security practices relating to Plaintiffs' PII))—are also sufficient.  *See TransUnion*, 594 U.S. at 424; *see also Savidge*, 727 F. Supp. 3d at 692.

In sum, the Court finds that Plaintiffs have alleged a sufficiently concrete injury for purposes of Article III standing.[7]  *See Savidge*, 727 F. Supp. 3d at 690–694; *Haney*, 747 F. Supp. 3d at 1104–06.

### 3.    Traceability

Finally, Yum contends that Sidler's injuries are not traceable to Yum's conduct because Sidler "does not allege that . . . the same information he provided Yum[] was used to initiate any alleged unauthorized activity," that "he had not been the victim of identity theft before" the data breach, or that "he has not been previously impacted by a prior data breach."  (D.N. 51, PageID.815)  But traceability "is not focused on whether the defendant caused the plaintiff's injury

---

[7] Because the Court finds that Plaintiffs' loss of privacy and related mitigation costs satisfy the concreteness requirement, it need not consider the parties' additional arguments relating to Plaintiffs' loss of time, anxiety, loss of value in PII, and benefit-of-the-bargain injuries.  Although each named plaintiff in a class action must "allege an individual injury" and "cannot piggyback off the injuries" suffered by other class members, *Fox v. Saginaw Cnty.*, 67 F.4th 284, 294 (6th Cir. 2023) (quotation omitted), each Plaintiff here has alleged that their PII was stolen by cybercriminals and is imminently at risk of being sold to additional unauthorized third parties. (D.N. 42, PageID.306 ¶ 67)  In addition, all four Plaintiffs have alleged that they incurred mitigation costs.  (*Id.*, PageID.319 ¶ 118)

in the liability sense, . . . because causation to support standing is not synonymous with causation sufficient to support a claim." *Galaria*, 663 F. App'x at 390 (internal quotations omitted). Indeed, "the Supreme Court has made clear that '[p]roximate causation is not a requirement of Article III standing.'" *Id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014)). Instead, the traceability analysis "mainly serves 'to eliminate those cases in which a third party and not a party before the court causes the injury.'" *Id.* (quoting *Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 542 (6th Cir. 2004)). Ultimately, traceability "requires more than speculative but less than but-for causation." *Id.* (quotation omitted).

Yum does not dispute that Sidler received a notification from Yum that his data was exposed in the data breach. (D.N. 51, PageID.806) And as discussed above, Sidler has alleged injury in fact—imminent risk of identity theft, loss of privacy, and mitigation costs—resulting from the data breach. (*See* D.N. 42, PageID.335–38 ¶¶ 205–217; *id.*, PageID.319 ¶ 118) Plaintiffs' second amended complaint adequately links the data breach to these harms by alleging that the data breach occurred because of Yum's failure to properly protect Plaintiffs' PII. (*See, e.g.*, D.N. 42, PageID.303 ¶¶ 48–54) Ultimately, these allegations satisfy the traceability requirement because they assert "more than speculative but less than but-for causation" between Yum's failures to protect Sidler's PII and the data breach. *See Galaria*, 663 F. App'x at 390 (quotation omitted); *see also TransUnion*, 594 U.S. at 423 (explaining that traceability requires "that the injury was likely caused by the defendant").

In sum, the Court concludes that Plaintiffs have established Article III standing. As a result, the Court will deny Yum's motion to dismiss pursuant to Rule 12(b)(1).[8]

---

[8] Yum does not contest the redressability requirement. (D.N. 51, PageID.807–816)

**B.**     **Motion to Compel Arbitration**

Yum next moves to compel arbitration of Beasley and Doss's claims pursuant to the Federal Arbitration Act.  (D.N. 52)  Plaintiffs oppose the motion.  (D.N. 83)  Arbitrability is a threshold issue that must be decided before Yum's remaining motions.  *See Yaroma v. Cashcall, Inc.*, 130 F. Supp. 3d 1055, 1060 (E.D. Ky. 2015) (explaining that "*before* reaching substantive issues of the dispute, courts should first decide the threshold question of arbitrability" (citation and internal quotation omitted) (emphasis in original)).  Moreover, the Court must apply "the standards that apply on summary judgment" when deciding a motion to compel arbitration under the FAA.  *See Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 835 (6th Cir. 2021); *see also Beam Partners, LLC v. Atkins*, 340 F. Supp. 3d 627, 638 (E.D. Ky. 2018) ("Finally, in evaluating motions to compel arbitration, [c]ourts treat the facts as they would in ruling on . . . summary judgment." (internal quotation omitted)).

The Court evaluates four factors when considering a motion to compel arbitration under the Federal Arbitration Act.

> [F]irst, [the court] must determine whether the parties agreed to arbitrate; second, [the court] must determine the scope of that agreement; third, if federal statutory claims are asserted, [the court] must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, [the court] must determine whether to stay the remainder of the proceedings pending arbitration.

*Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005) (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000)).  When analyzing these factors, "any doubts regarding arbitrability should be resolved in favor of arbitration."  *Id.* (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*, 460 U.S. 1, 24–25 (1983)).

### 1.    Agreement to Arbitrate

"Arbitration under the [FAA] is a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).  In other words, "no matter how strong[ly] the federal policy favors arbitration, arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *In re: Auto. Parts Antitrust Litig.*, 951 F.3d 377, 383 (6th Cir. 2020) (quoting *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005)).

In determining whether Beasley and/or Doss agreed to arbitrate their claims, the Court must consider applicable state contract law.  *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  The parties agree that Indiana law applies to Beasley and Illinois law applies to Doss (D.N. 52, PageID.555; D.N. 83, PageID.943, 950), and the Court will therefore apply Indiana and Illinois law, respectively.  The Court notes, however, that the FAA "preempts any state rule discriminating on its face against arbitration." *Kindred Nursing Centers Ltd. P'ship v. Clark*, 581 U.S. 246, 251–52 (2017).

### i.    Agreement to Arbitrate—Beasley

Beasley was employed at a Pizza Hut restaurant "from November 9, 2018[,] through May 11, 2019; from June 1, 2020[,] through September 26, 2020; and from September 28, 2020[,] through December 17, 2020."[9]  (D.N. 52-2, PageID.573 ¶ 18)  As a condition of her employment,

---

[9] The parties dispute exactly what entity Beasley worked for.  Plaintiffs assert that "it is unclear what specific entities . . . Beasley worked for" because Yum has "provide[d] no documentary evidence supporting" the conclusion that Pizza Hut of America, LLC (PHA) was Beasley's employer.  (D.N. 83, PageID.941)  Yum has produced an affidavit from Yum Director of Field Human Resources Amy Gingerich stating that "Beasley was employed by PHA."  (D.N. 52-2, PageID.573 § 18)  But this statement is contradicted somewhat by Beasley's arbitration agreement, which states that it is between "Pizza Hut, LLC . . . and [Beasley]."  (D.N. 52-3, PageID.588)  Moreover, Yum's affidavits clearly indicate that PHA and Pizza Hut, LLC are different entities (*see, e.g.*, D.N. 52-2, PageID.569–70 ¶¶ 2–3), and do not explain how Pizza Hut, LLC is related

Beasley was required to execute an arbitration agreement.  (*Id.*, PageID.570 ¶ 5)  Beasley's arbitration agreement was presented through the "PeopleMatter" online portal operated by vendor Fourth People Matter LLC.  (*Id.*, PageID.571–74 ¶¶ 7–8, 19)  According to PeopleMatter's records, Beasley "electronically agreed" to the arbitration agreement on November 10, 2018, at 6:40 a.m. through the PeopleMatter portal.[10]  (*Id.*, PageID.574 ¶ 21; D.N. 52-3, PageID.587–88)

Under Indiana law, "arbitration is a matter of contract, [and] there is a presumption of arbitrability." *In re: Auto. Parts*, 951 F.3d at 381.  The Court must "begin with the plain language of the contract, reading it in context and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole." *Id.* at 383 (quoting *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012)).  In relevant part, the agreement here provided:

> Pizza Hut, LLC on behalf of itself and its parents and affiliates, officers and directors (collectively, "Pizza Hut") and [Beasley] agree to use confidential binding arbitration, instead of going to court, for any claims, including any claims now in existence or that may exist in the future (a) that [Beasley] may have against Pizza Hut and/or its current or former employees or (b) that Pizza Hut may have against [Beasley]. Without limitation, such claims include any concerning wages, expense reimbursement, compensation, leave, employment (including, but not limited to, any claims concerning harassment, discrimination, or retaliation), conversion, breach of fiduciary duty, and/or termination of employment.

(D.N. 52-3, PageID.588)

Plaintiffs contend that this arbitration agreement "expressly states that it is between the signatory and Pizza Hut, LLC" and that Beasley therefore never agreed to arbitrate claims against

---

to PHA.  (*See generally* D.N. 52-1; D.N. 52-2)  Thus, the record is unclear as to the exact entity that employed Beasley.  In any event, this minor discrepancy does not affect the Court's analysis.
[10] Indiana law recognizes the validity of electronically entered agreements.  *See, e.g.*, *Jallali v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 908 N.E.2d 1168, 1173 (Ind. Ct. App. 2009) (noting that such agreements are enforceable so long as "the party clicking it had reasonable notice of and manifested assent to the agreement").

Yum. (D.N. 83, PageID.951) But Indiana law forecloses this argument. In *Doe v. Carmel Operator, LLC*, the Indiana Supreme Court considered an arbitration clause that explicitly encompassed claims against an entity's "employees, agents, officers, directors, [and] any parent, subsidiary or affiliate" of the entity. 160 N.E.3d 518, 522 (Ind. 2021). The court explained that such language reflects a signatory's "duty to arbitrate her claims against any of the[] listed parties since they [are] third-party beneficiaries who . . . explicitly benefit from [the agreement]." *Id.* Here, Plaintiffs do not dispute that Yum is Pizza Hut, LLC's parent corporation. (*See generally* D.N. 83; *see also* D.N. 52-1, PageID.657 ¶ 3) Thus, because Beasley's arbitration agreement explicitly includes Pizza Hut, LLC's "parents" (D.N. 52-3, PageID.588), Yum can enforce the agreement as a third-party beneficiary. *See Daimler Chrysler Corp. v. Franklin*, 814 N.E.2d 281, 286 (Ind. Ct. App. 2004) (explaining that there must be "a clear intent by the parties to the contract to benefit the third party"). In sum, Beasley agreed to arbitrate any claims against Yum, and the first *Glazer* factor supports arbitration of her claims. *See Glazer*, 394 F.3d at 451.

### ii.    Agreement to Arbitrate—Doss

Doss began working at a Pizza Hut restaurant on August 20, 2009. (D.N. 52-2, PageID.574 ¶ 22) At that time, the restaurant used paper employment applications that potential employees would fill out by hand. (*Id.*) Doss's application states that it is for employment at "Pizza Hut, Inc."[11] (D.N. 52-2, PageID.577) As a condition of employment, Doss "signed an

---

[11] As with Beasley, the parties dispute which entity employed Doss. Although Yum has produced an affidavit stating that "Doss was . . . employed by PHA" (D.N. 52-2, PageID.574 ¶ 22), Plaintiffs note that Doss's agreement mentions only "Pizza Hut, Inc." and that no evidence in the record "connect[s] Pizza Hut, Inc. to PHA." (D.N. 83, PageID.941) Indeed, the record indicates that Pizza Hut, Inc. and PHA are separate entities, and Yum has not explained why Doss's arbitration agreement with "Pizza Hut, Inc." should be interpreted as between Doss and PHA. (*See generally* D.N. 52-1; D.N. 52-2) Thus, the record is unclear as to what entity employed Doss. In any event, this minor discrepancy does not affect the Court's analysis.

employment application containing an arbitration provision on August 8, 2009." (D.N. 52-2, PageID.574 ¶ 24; *id.*, PageID.577–78)  In relevant part, the agreement provided that

> Pizza Hut and [Doss] agree[d] to use confidential binding arbitration, instead of going to court, for any claims that ar[o]se between [Doss] and Pizza Hut, its related companies, and/or their current or former employees.  Without limitation, such claims would include any concerning compensation, employment (including, but not limited to, any claims concerning sexual harassment or discrimination), or termination of employment.

(*Id.*, PageID.578)  The agreement did not purport to define the term "Pizza Hut" or "related companies." (*See generally id.*)  But a separate section of the application entitled "Miscellaneous Information" instructed Doss to check various boxes if she had "worked for any of our affiliated companies (listed below)." (*Id.*)   The "affiliated companies" listed were "Yum! Restaurant Services Group," "KFC," "Pizza Hut," "Taco Bell," "Long John Silver's," "A&W," and "Franchisee/Licensee." (*Id.*)

Plaintiffs do not dispute that at the time Doss's agreement was signed, Pizza Hut, Inc. was an indirect subsidiary of Yum.[12]  (*See generally* D.N. 83)  But Plaintiffs assert that the plain terms of Doss's arbitration agreement do not apply to her claims against Yum because "there is no express provision in the arbitration clause . . . that mentions [Yum] by name as required under . . . Illinois law." (*Id.*, PageID.944)  Yum, in turn, contends that it "is an intended-third-party beneficiary to the arbitration agreement because it is part of a class expressly identified by the agreement—namely, it is one of Pizza Hut's related companies." (D.N. 52, PageID.562)  Plaintiffs respond that Yum's definition is unclear and overbroad and that, in any event, "had Pizza Hut, Inc., intended for [Yum] to be a third-party beneficiary covered by the arbitration clause, it could

---

[12] Following a corporate reorganization, Pizza Hut, LLC is the successor by merger of Pizza Hut, Inc.  (D.N. 52-1, PageID.567 ¶ 3)

21

have easily named [Yum] in the clause or defined the term 'Pizza Hut' to encompass [Yum]." (D.N. 83, PageID.945–47)

"Illinois courts . . . recognize 'a strong presumption against conferring contractual benefits on noncontracting third parties.'" *Sosa v. Onfido, Inc.*, 8 F.4th 631, 639 (7th Cir. 2021) (quoting *Marque Medicos Farnsworth, LLC v. Liberty Mut. Ins. Co.*, 117 N.E.3d 1155, 1159 (Ill. App. Ct. 2018)). To overcome this presumption, "the implication that the contract applies to third parties must be so strong as to be practically an express declaration." *Id.* (quoting *155 Harbor Drive Condo. Ass'n v. Harbor Point Inc.*, 568 N.E.2d 365, 375 (1991)). "The language of the contract must show that 'the contract was made for the direct, not merely incidental, benefit of the third person.'" *Id.* (quoting *Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 924 (2009)). Moreover, the parties' intention to benefit a third party "must be shown by an express provision in the contract identifying the third-party beneficiary by name or by description of a class to which the third party belongs." *Id.* (quotation omitted).

Yum has failed to overcome Illinois's "strong presumption against conferring contractual benefits on noncontracting third parties." *Sosa*, 8 F.4th at 639. No "express provision," *id.*, in Doss's arbitration agreement identifies Yum as a third-party beneficiary. (D.N. 52-2, PageID.577–78) And although the agreement does explicitly benefit Pizza Hut's "related companies," (*id.*), this is not unambiguously a "class to which [Yum] belongs." *See Sosa*, 8 F.4th at 639. Under Illinois law, "if the words used in [a contract] are reasonably susceptible to more than one meaning, they are ambiguous and will be strictly construed against the drafter." *Cent. Illinois Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (2004). To define "related companies," Yum offers that related means "[c]onnected in some way; having a relationship to or with something else." (D.N. 52, PageID.562 (quoting "Related," Black's Law Dictionary (11th ed. 2019))) But any number of

22

companies could be "connected in some way" to Pizza Hut—technology vendors, produce suppliers, contracted IT technicians—and this definition does nothing to resolve the ambiguity of the term.[13]  In any event, no matter how one reads the arbitration agreement, it does not present an "implication that the contract applies to [Yum] . . . so strong as to be practically an express declaration," as required by Illinois law.[14]  *Sosa*, 8 F.4th at 639.  And although Yum is correct that under the FAA, "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration"  (D.N. 90, PageID.1005 (quoting  *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 189 (2019))), that rule is inapposite here.  The present dispute does not involve the *scope* of Doss's arbitration agreement with Yum—rather, the question is whether Doss agreed to arbitrate any claims against Yum in the first place.  Under the "first principle" of FAA jurisprudence, "[a]rbitration is strictly a matter of consent."  *Lamp Plus*, 587 U.S at 184 (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010)) (alteration in original).  Considering the ambiguity in Doss's agreement, the Court cannot say that requiring Doss to arbitrate her claims against Yum would satisfy this essential "first principle."  *See id.*

In sum, Doss's arbitration agreement does not cover Yum as an intended third-party beneficiary under Illinois law.[15]  Because Yum has not alleged that Doss signed any other

---

[13] Reference to Beasley's arbitration agreement illustrates this point.  Beasley's agreement specified that it applied to Pizza Hut, LLC's "parents and affiliates."  (D.N. 52-3, PageID.588)  The Court agrees with Plaintiffs that "had Pizza Hut, Inc., intended for [Yum] to be a third-party beneficiary covered by the arbitration clause, it could have easily named [Yum] in the clause or defined the term 'Pizza Hut' to encompass [Yum]," as was done in Beasley's agreement.  (D.N. 83, PageID.945–47)

[14] The Court is similarly unconvinced by Yum's argument that the term "related companies" should be read to include Yum based on the agreement's "Miscellaneous Information" section.  (D.N. 52, PageID.562–63)  The list of "affiliated companies" in that section does not include Yum! Brands, Inc., the defendant in this action.  (D.N. 52-2, PageID.578)

[15] To the extent that Yum relies on *Little Mountain, LLC v. DR Guns, LLC* (*see* D.N. 52, PageID.562), that case is not binding authority and, in any event, involved an agreement under Ohio law.  No. 1:22 CV 1471, 2024 WL 1255426, at *4–8 (N.D. Ohio Mar. 25, 2024),

arbitration agreements, the Court will deny Yum's motion to compel arbitration of Doss's claims.[16] *See in re: Auto. Parts*, 951 F.3d at 383.

<h2 align="center">2.  Scope of the Agreement</h2>

Having determined that Beasley and Yum entered into an arbitration agreement, the Court now "must determine the scope of that agreement." *Glazer*, 394 F.3d at 451. When an arbitration agreement exists between the parties, a "presumption of arbitrability" applies to broadly worded arbitration clauses.[17] *Litton Fin. Printing Div. v. Nat'l Labor Relations Bd.*, 501 U.S. 190, 209 (1991) (quoting *AT&T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 650 (1986)); *see also Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005) ("When faced with a broad arbitration clause, such as one covering any dispute arising out of an agreement, a court should follow the presumption of arbitration and resolve doubts in favor of arbitration."). Here, the agreement requires arbitration of "any claims, including any claims now in existence or that may exist in the future . . . . without limitation . . . includ[ing] any concerning wages, expense reimbursement, compensation, leave, employment (including, but not limited to, any claims concerning harassment, discrimination, or retaliation), conversion, breach of fiduciary duty, and/or termination of employment." (D.N. 52-3, PageID.588) By its express terms, the agreement is broadly worded and encompasses all claims before the Court. (*See id.*) Thus, arbitrability should be presumed, and the second factor favors arbitration. *See Litton Fin. Printing Div.*, 501 U.S. at 209; *Simon*, 398 F.3d at 775.

---

[16] Because the Court finds that Doss did not agree to arbitrate her claims against Yum, it need not consider the parties' additional arguments relating to Doss's agreement. (*See, e.g.*, D.N. 83, PageID.947–49 (arguing the agreement is unconscionable))

[17] Indiana law recognizes the same presumption. *See, e.g.*, *Bielfeldt v. Nims*, 805 N.E.2d 415, 417–18 (Ind. Ct. App. 2004).

The Court cannot agree with Plaintiffs' arguments to the contrary. (*See* D.N. 83,
PageID.952–53)  Plaintiffs admit that Beasley was required to provide her PII to Yum as a
condition of her employment. (D.N. 42, PageID.326 ¶ 149)  Thus, a claim based on the exposure
of that very PII to unauthorized third parties is clearly related to Beasley's employment, as required
by the arbitration agreement. (D.N. 52-3, PageID.588)  This conclusion is further warranted in
light of the federal and Indiana-law presumptions in favor of arbitration when considering broadly-
worded arbitration agreements. *See Bielfeldt*, 805 N.E.2d at 417–18*; Litton Fin. Printing Div.*,
501 U.S. at 209; *Simon*, 398 F.3d at 775.

### 3.    Unconscionability and Related Arguments

Finally, Plaintiffs assert that the Court should not enforce Beasley's arbitration agreement
on the grounds that it is unconscionable and violates the public policy of Kentucky insofar as it
requires confidential arbitration. (D.N. 83, PageID.954–57)  Although the parties agree that
Indiana law applies to Beasley's arbitration agreement (D.N. 52, PageID.555; D.N. 83,
PageID.943, 950), Plaintiffs are correct that Kentucky courts will decline to apply another
jurisdiction's law when it "violates a public policy as declared by Kentucky courts or the Kentucky
General Assembly." *Woods v. Standard Fire Ins. Co.*, 411 F. Supp. 3d 397, 403 (E.D. Ky. 2019).
Such a course is only appropriate, however, where the public policy is a "well-founded rule of
domestic policy established to protect the morals, safety or welfare of [Kentucky's] people." *State
Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 882 (Ky. 2013) (internal
quotation and citation omitted).  And importantly, "where no Kentucky resident has been affected,
rarely will that standard be met" because "nothing requires a Kentucky court to interfere with the
balance [another state] has chosen for its citizens." *See id.* (collecting cases).  Here, Beasley is not
a Kentucky resident. (D.N. 42, PageID.297 ¶ 19)  Thus, "nothing requires" the Court to "interfere

25

with the balance [Indiana] has chosen for its citizens," and Plaintiffs' argument relating to Kentucky public policy fails.[18] *Hodgkiss-Warrick*, 413 S.W.3d at 882 (citations omitted).

As to Plaintiffs' unconscionability argument, "generally applicable state-law contract defenses like . . . unconscionability[] may invalidate arbitration agreements" under the FAA. *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004) (citations omitted). Nevertheless, "the federal policy favoring arbitration . . . is taken into consideration even in applying ordinary state law." *Id.* (quoting *Garrett v. Hooters–Toledo*, 295 F. Supp. 2d 774, 779 (N.D. Ohio 2003)). Under Indiana law, adhesion contracts, or "standardized contract[s], which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it," are not per se unconscionable. *Sanford v. Castleton Health Care Ctr., LLC*, 813 N.E.2d 411, 417 (Ind. Ct. App. 2004). Instead, an agreement is unconscionable if "a great disparity in bargaining power exists between the parties, such that the weaker party is made to sign a contract unwillingly or without being aware of its terms." *Id.* (citation omitted). Contracts are "not unenforceable merely because one party enjoys advantages over another"; to be unconscionable, "[t]he contract must be such as no sensible man not under delusion, duress or in distress would make, and such as no honest and fair man would accept." *Id.* (citations and internal quotations omitted) (alteration in original).

Plaintiffs argue that Beasley's arbitration agreement is unconscionable for two reasons. First, Plaintiffs contend that "Beasley was ambushed with the agreement the day after accepting

---

[18] Even if Beasley were a Kentucky resident, the Court could not conclude that Kentucky courts would decline to enforce Beasley's agreement. Plaintiffs rely on *Schnuerle v. Insight Communications Co.*, but that decision considered confidential arbitration only in the context of agreements between consumers and businesses. *See* 376 S.W.3d 561, 577–79 (Ky. 2012). Without further guidance regarding S*chnuerle*'s applicability to arbitration agreements in the employment context, the Court declines to extend it here. In any event, Yum has stated that it "is not seeking to force confidentiality" of Beasley's arbitration. (D.N. 90, PageID.1012)

employment as part of the onboarding process." (D.N. 83, PageID.954)  But as noted above, Indiana law does not prohibit adhesion contracts. *Sanford*, 813 N.E.2d at 417 (Ind. Ct. App. 2004). And courts applying Indiana law routinely enforce arbitration provisions presented as a condition of employment. *See Miller v. Stitch Fix, Inc.*, No. 1:23-CV01392-JPH-TAB, 2023 WL 8433709, at *2 (S.D. Ind. Dec. 5, 2023) (citing *Tenbrink v. Toshiba Am. Med. Sys., Inc.*, No. 1:12-cv-01214-TWP-DKL, 2013 WL 3071276, at *1 (S.D. Ind. June 18, 2013)).  Moreover, Plaintiffs do not dispute that Beasley had time to review the arbitration agreement before signing it. (*See* D.N. 83, PageID.954–55)  Thus, this argument fails.  Second, Plaintiffs argue that Beasley's arbitration agreement is unconscionable "because it seeks to encompass all claims, regardless of when they accrue, brought against Pizza Hut, LLC or its parents and affiliates, which are not defined." (*Id.*, PageID.955)  But Plaintiffs have provided no binding authority that suggests broadly worded arbitration agreements are unconscionable under Indiana law, and the Court is aware of none. (*See id.*, PageID.955)  As a result, this argument is also unsuccessful.

Finally, as to the third and fourth FAA factors, the only federal claim asserted by Beasley is a claim under the Declaratory Judgment Act. (*See* D.N. 42, PageID.342–59)  Plaintiffs do not assert that this claim is non-arbitrable (*see generally* D.N. 83), and courts in this circuit have previously held that declaratory-judgment claims are arbitrable. *See, e.g.*, *Cap. Healthcare, LLC v. Amkai, LLC*, No. 2:22-CV-12019, 2023 WL 3075885, at *1–2, 5 (E.D. Mich. Apr. 25, 2023). Thus, there is no indication that Congress intended Beasley's claims to be non-arbitrable. *See Glazer*, 394 F.3d at 451 (quotation omitted).  Moreover, since all of Beasley's claims are subject to arbitration, the Court need not consider whether it is appropriate to stay only part of the proceedings relating to her claims. *See id.*

In sum, the FAA factors demonstrate that Beasley's claims are subject to arbitration.  And because Yum has requested that the Court stay Beasley's claims pending arbitration (*see generally* D.N. 52), the Court must do so.  *See* 9 U.S.C. § 3 (providing that "on application of one of the parties," the Court shall stay an action subject to arbitration "until such arbitration has been had in accordance with the terms of the agreement"); *see also Smith v. Spizzirri*, 601 U.S. 472, 478–79 (2024) (requiring courts to stay proceedings involving arbitrable disputes only when "a party requests a stay pending arbitration").  Therefore, Beasley and Yum will be compelled to arbitrate in accordance with their agreement, and Beasley's claims in this action will be stayed pending conclusion of that arbitration.[19]

### C.    Motion to Strike Nationwide Class Allegations

Next, Yum moves to strike the nationwide class allegations in Plaintiffs' second amended complaint (D.N. 42) on the ground that "variations in the applicable state laws [across Plaintiffs' claims] will render nationwide class treatment . . . impracticable, unworkable, and unmanageable." (D.N. 53, PageID.836)  Plaintiffs oppose the motion, arguing first that any motion to strike was waived by Yum's prior motion to dismiss under Fed. R. Civ. P. 12(b) and second that the nationwide class allegations are proper because Kentucky law will uniformly apply.  (D.N. 81, PageID.890–91)

As a preliminary matter, the Court disagrees with Plaintiffs that Yum's motion is procedurally improper.  Although Fed. R. Civ. P. 12(g)(2) provides that "a party that makes a motion under [Rule 12] must not make another motion under [Rule 12] raising a defense or

---

[19] Because courts regularly stay only those portions of a case that are subject to an arbitration agreement, and because Yum does not request a stay of the entire action, the Court will stay Beasley's claims only. *See, e.g.*, *Riney v. GGNSC Louisville St. Matthews, LLC*, No. 3:16-CV-00122-JHM, 2016 WL 2853568, at *4 (W.D. Ky. May 13, 2016) (staying in part); *Mitchell v. EEG, Inc.*, No. 3:15-CV-00903-JHM, 2016 WL 2903286, at *3 (W.D. Ky. May 18, 2016) (same).

28

objection that was available to the party but omitted from its earlier motion," "this rule is intended to eliminate unnecessary delays at the pleading stage of a case by avoiding the piecemeal consideration of pretrial motions." *Mulberry Phosphates, Inc. v. City of Toledo*, 125 F.3d 856, at *5 (6th Cir. 1997) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 701 (6th Cir. 1978)). When a party files multiple separate motions under Rule 12 at the same time, there is no threat of "unnecessary delays" or "piecemeal consideration of pretrial motions" that would warrant requiring an omnibus motion. *See id*. Indeed, courts routinely allow the filing, at the same time, of multiple separate motions to dismiss and to strike under Rule 12 without remarking upon whether they should have been filed as one motion.[20] *See, e.g.*, *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 945 (6th Cir. 2011); *CWI, Inc. v. Smartdog Servs., LLC*, No. 1:15-CV-00139-GNS, 2016 WL 2654085, at *1 (W.D. Ky. May 9, 2016). Here, Yum filed its motion to strike on the same day as its motion to dismiss, and therefore the purposes of Fed. R. Civ. P. 12(g)(2) would not be served by denying Yum's motion to strike on procedural grounds. (D.N. 51; D.N. 53)

Moreover, the Court is not convinced by Plaintiffs' citation to *Jones v. Lubrizol Advanced Materials, Inc*., 583 F. Supp. 3d 1045 (N.D. Ohio 2022), for the proposition that Yum "is required to file an omnibus Rule 12 motion." (D.N. 81, PageID.893) In *Jones*, the defendants did not file their motions at the same time and instead moved to strike more than a year after moving to dismiss. *See Jones*, No. 1:20-cv-00511-JPC, ECF Nos. 14, 15 (motions to dismiss filed May 29, 2020); *id.*, ECF No. 54 (joint motion to strike class allegations filed November 19, 2021). Thus, in that case, there was a potential for "unnecessary delay[]" and the "piecemeal consideration of pretrial motions." *See Mulberry*, 125 F.3d 856, at *5. Here, in contrast, Yum filed its motions to

---

[20] This practice is supported by the language of the rule: pursuant to Fed. R. Civ. P. 12(g)(1), "motion[s] under [Rule 12] *may* be joined with any other motion allowed by [Rule 12]." Fed. R. Civ. P. 12(g)(1) (emphasis added).

dismiss and to strike on the same day.  (D.N. 51; D.N. 53)  And in any event, the *Jones* court nevertheless granted the defendants' motion to strike despite the year-long delay between the motion to dismiss and motion to strike.  583 F. Supp. 3d at 1059.  The Court also disagrees that Yum has somehow "flouted Local Rule L.R. 7-1(d)."  (D.N. 81, PageID.894)  Both Yum's motion to dismiss and motion to strike comply with the Court's page-limit requirements.  (*See* D.N. 53 (20 pages); D.N. 51 (25 pages))

"Rule 12(f) is the procedural vehicle for striking class allegations."  *Eldridge v. Cabela's Inc.*, No. 3:16-CV-536-DJH, 2017 WL 4364205, at *7 (W.D. Ky. Sept. 29, 2017) (citing *Nevada-Martinez v. Ahmad*, No. 5:15-cv-239-JMH, 2016 WL 7888046, at *3 (E.D. Ky. June 17, 2016)).  Rule 12(f) allows the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "The purpose of a motion to strike is to avoid the expense of litigating spurious issues by dispensing with them before trial."  *Duncan v. Jefferson Cnty. Bd. of Educ.*, No. 3:19-CV-00495-GNS-RSE, 2021 WL 1109355, at *7 (W.D. Ky. Mar. 23, 2021) (internal quotation omitted).  "[M]otions to strike are viewed with disfavor and are not frequently granted."  *Operating Engineers Loc. 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (citations omitted).  Nevertheless, Yum "may move to strike class allegations [under Rule 12(f)] even before [Plaintiffs] ha[ve] filed a motion for class certification."  *Eldridge*, 2017 WL 4364205, at *7 (citing *Pilgrim*, 660 F.3d at 949)).  After all, "Rule 23(c)(1)(A) says that the [Court] should decide whether to certify a class '[at] an early practicable time' in the litigation, and nothing in the rules says that the [C]ourt must await a motion by the [P]laintiffs."  *Pilgrim*, 660 F.3d at 949 (quoting Fed. R. Civ. P. 23(c)(1)(A)).

In moving to strike Plaintiffs' nationwide class allegations, Yum "has the burden of demonstrating from the face of [Plaintiffs'] complaint that it will be impossible to certify the class

as alleged, regardless of the facts [Plaintiffs] may be able to prove." *Eldridge*, 2017 WL 4364205, at *7 (citing *Jimenez v. Allstate Indem. Co.*, No. 07-CV-14494, 2010 WL 3623176, at *3 (E.D. Mich. Sept. 15, 2010)). "The central question is whether the Rule 23 prerequisites are met[,] . . . . [and] if [Plaintiffs] will be unable to establish even one of the Rule 23 prerequisites, the class allegations must be stricken." *Id.* (citations omitted). Here, Yum argues that Plaintiffs' nationwide class allegations must be struck because Plaintiffs' claims "contain shifting elements of proof that vary across their states of residence" and assert causes of action "that some states do not even recognize." (D.N. 53, PageID.836) With this argument, Yum contests Plaintiffs' ability to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members," as required by Federal Rule of Civil Procedure 23(b)(3). *See* Fed. R. Civ. P. 23(b)(3). Such a failure would, if sufficiently demonstrated, warrant granting Yum's motion. Indeed, in *Pilgrim*, the Sixth Circuit affirmed an order striking nationwide class allegations because the putative class members' claims were "governed by different States' laws." 660 F.3d at 949; *see also Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 582 (6th Cir. 2013); *Oom v. Michaels Cos.*, No. 1:16-CV-257, 2017 WL 3048540, at *7 (W.D. Mich. July 19, 2017). And even when there are "many common issues of fact" among the putative class members' claims, other circuits routinely do the same. *See Pilgrim*, 660 F.3d at 948–49 (collecting cases).

Plaintiffs maintain that Kentucky law applies uniformly to their claims. (D.N. 81, PageID.890) But to pass constitutional muster, "where a plaintiff seeks to apply a single state's law in a multi-state class action, that state must have a 'significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary [n]or unfair.'" *Corder v. Ford Motor Co.*, 272 F.R.D. 205, 208 (W.D. Ky. 2011) (quoting *Phillips*

31

*Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985)).  Thus, the Court's task is threefold.  First, the Court must determine whether uniform application of Kentucky law in this case would satisfy the constitutional requirements outlined by the Supreme Court in *Shutts*.  Second, if Kentucky law can be uniformly applied consistent with the Constitution, the Court must analyze whether Kentucky's choice-of-law principles support the application of Kentucky law to Plaintiffs' claims.  Finally, and relatedly, the Court must determine whether Yum has met its burden to show "that it will be impossible to certify the class as alleged, regardless of the facts [Plaintiffs] may be able to prove." *See Eldridge*, 2017 WL 4364205, at *7 (citation omitted).

### 1. Constitutional Analysis

Plaintiffs purport to represent a class of "[a]ll individuals residing in the United States whose Private Information was maintained on Yum! Brands, Inc.'s computer systems and who were sent a notice of the January 2023 Data Breach."  (Docket No. 42, PageID.338 ¶ 219)  This putative class admittedly includes individuals from all fifty states.  (*See id.*)

The Court must "first determine whether [Kentucky] law conflicts in any material way with any other law which could apply," because "there can be no injury in applying [Kentucky] law if it is not in conflict with that of any other jurisdiction connected to this suit."[21]  *Shutts*, 472 U.S. at 816; *see also Walker v. Ryan's Fam. Steak Houses, Inc.*, 400 F.3d 370, 377–78 (6th Cir. 2005). Plaintiffs raise a variety of state-law claims, including negligence, breach of implied contract, unjust enrichment, invasion of privacy,[22] breach of implied covenant of good faith and fair dealing,

---

[21] Plaintiffs are thus incorrect that Yum's "lengthy arguments as to variations in the elements of negligence, breach of confidence, and invasion of privacy merit no discussion."  (D.N. 81, PageID.899)  The potential variation across states' laws is relevant to the constitutional analysis mandated by *Shutts*.  472 U.S. at 816.

[22] Although this is styled as a generic breach-of-privacy claim, Plaintiffs appear to assert the specific cause of action of intrusion upon seclusion.  (*See* D.N. 42, PageID.353 ¶ 292 ("Defendant acted with such reckless disregard as to the safety of Plaintiffs' and Class Members' PII to rise to

and breach of confidence. (D.N. 42, PageID.342–57 ¶¶ 231–310) These causes of action vary considerably across the fifty states.[23] (*See* D.N 53-1–53-6, PageID.659–728 (charting the myriad variations in these causes of action across the various states' laws)) For example, many states do not recognize a cause of action for breach of confidence. *See, e.g.*, *Linman v. Marten Transp., Ltd.*, No. 22-CV-204-JDP, 2023 WL 2562712, at *7 (W.D. Wis. Mar. 17, 2023) (dismissing breach-of-confidence claim because Wisconsin does not recognize that cause of action). Similarly, the fifty states vary in their formulation of intrusion-upon-seclusion claims. *Compare Ferguson v. Innovate Loan Servicing Corp.*, No. 1:18-CV-3071-ELR-LTW, 2019 WL 4804272, at *2 (N.D. Ga. Aug. 7, 2019) (outlining elements under Georgia law), *with Alvarado v. Rainbow Inn, Inc.*, 312 F.R.D. 23 (D.D.C. 2015) (outlining elements under D.C. law), *and In re Google, Inc. Privacy Pol'y Litig.*, 58 F. Supp. 3d 968, 987 (N.D. Cal. 2014) (outlining elements under California law). The same is true for breach of implied contract.[24] *See, e.g.*, Breach of implied contract claim, 16

---

the level of intentionally allowing the intrusion upon Plaintiffs' and Class Members' seclusion.")) The Court will interpret this claim accordingly.

[23] This fact has been noted by courts across the country for many of Plaintiffs' claims. *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996) ("The law of negligence, including subsidiary concepts such as duty of care, foreseeability, and proximate cause, may . . . differ among the states only in nuance, . . . but nuance can be important, and its significance is suggested by a comparison of differing state pattern instructions on negligence and differing judicial formulations of the meaning of negligence and the subordinate concepts." (quoting *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995)) (omissions in original)); *Colley v. Procter & Gamble Co.*, No. 1:16-CV-918, 2016 WL 5791658, at *7 (S.D. Ohio Oct. 4, 2016) ("Varying state laws preclude Plaintiffs from pursuing an unjust enrichment claim on behalf of a nationwide class . . . . Some states do not recognize unjust enrichment as an independent cause of action."); *Lane v. Wells Fargo Bank, N.A.*, No. C 12-04026 WHA, 2013 WL 3187410, at *4 (N.D. Cal. June 21, 2013) ("Adjudicating plaintiffs' claim for . . . breach of the implied covenant of good faith and fair dealing would require applying a multitude of different state law standards").

[24] Yum's motion includes several charts that outline the relevant differences between states' laws for Plaintiffs' claims. (*See* D.N. 53-6, PageID.716–28 (compiling variations across states' laws for implied-contract claims)) The Court has considered these charts accordingly.

Bus. & Com. Litig. Fed. Cts. § 172:35 (5th ed.) (collecting cases and discussing state variations in implied-contract claims).

Having determined that the potentially applicable law varies considerably, the Court must consider whether Kentucky has a "significant contact" or "state interests" in the putative class members' claims such that Kentucky law can nevertheless uniformly apply in a manner "neither arbitrary or unfair." *See Corder*, 272 F.R.D. at 208 (quoting *Shutts*, 472 U.S. at 818). Undoubtedly, Kentucky has significant contacts to the claims of class members who were employed in Kentucky. *See id.* at 208–09 (noting that Kentucky "has a strong interest in regulating trade practices within its own borders"). As to the non-Kentucky members of Plaintiffs' putative class, Plaintiffs argue that Kentucky law can uniformly apply because Yum "is headquartered in Kentucky [and thus] it is difficult to imagine a more significant relationship between Defendant's data security policies and failures than the state of Kentucky." (D.N. 81, PageID.898) Plaintiffs also point to Kentucky's data-breach notification statute, Ky. Rev. Stat. § 365.720, for the proposition that "Kentucky has a significant interest in preventing and address[ing] data breaches by Kentucky Companies under Kentucky law." (D.N. 81, PageID.987)

In light of these contacts, uniformly applying Kentucky law would not be "arbitrary or unfair." *See Corder*, 272 F.R.D. at 208 (quoting *Shutts*, 472 U.S. at 818). Although many of the putative class members presumably signed their employment agreements with Yum's subsidiaries and franchisees in states other than Kentucky (*see* D.N. 42, PageID.338 ¶ 219), the Supreme Court has characterized the constitutional requirements in this context as merely a "*modest* restriction[] on the application of forum law." *Shutts*, 472 U.S. at 818 (emphasis added). Kentucky undeniably has an interest in "regulating trade practices within its own borders," *Corder*, 272 F.R.D. at 208–09, including in the data-breach context. *See* Ky. Rev. Stat. § 365.720 et. seq. And Yum, the

parent corporation that collected Plaintiffs' PII and suffered the data breach central to the present claims, is headquartered in Kentucky and has its principal place of business in Kentucky.  (D.N. 52-1, PageID.567 ¶ 3)  Thus, there are sufficient contacts between Plaintiffs' claims and Kentucky, and Kentucky has a sufficient interest in Plaintiffs' claims, such that uniformly applying Kentucky law in this case would not raise constitutional concerns.[25]  *See Corder*, 272 F.R.D. at 208 (quoting *Shutts*, 472 U.S. at 818).

## 2.    Kentucky Choice-of-Law Analysis

Next, the Court must determine whether Kentucky's choice-of-law principles support the application of Kentucky law to Plaintiffs' nationwide claims.[26]  Kentucky applies different choice-of-law rules to tort claims and contract claims.  *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009).  Regardless of the nature of the claims, however, Kentucky has "an extremely strong and highly unusual preference for applying Kentucky law even in situations where most states would decline to apply their own laws."  *Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017) (citations omitted).  The Sixth Circuit has "routinely recognized this provincial tendency when applying Kentucky's [choice-of-law] rules."  *See Dukes v. Mid-E. Athletic Conf.*, No. 3:16-CV-00303-RGJ-RSE, 2018 WL 6112415, at *2 (W.D. Ky. Nov. 21, 2018) (internal quotation omitted) (collecting cases).  Thus, for purposes of the present choice-of-law analysis, the Court is mindful that "Kentucky courts have applied Kentucky substantive law *whenever possible* . . . . unless there are overwhelming interests to the contrary."  *Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983).

---

[25] The Court observes that there appears to be minimal binding authority on how to properly apply *Shutts*.  In any event, for the reasons discussed above, *Shutts* is satisfied here.

[26] Kentucky is the forum state, and the Court must apply the choice-of-law rules of the forum state in diversity cases.  *Eakes v. Caudill*, No. 23-5255, 2023 WL 6236747, at *2 (6th Cir. Sept. 13, 2023); *see generally Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941).

###### i.     Tort Claims

For tort claims, "any significant contact with Kentucky calls for the application of Kentucky law." *Dukes*, 2018 WL 6112415, at *3 (internal quotations and citations omitted). And "though the precise determinants of [this] test are fact dependent, a Kentucky court's primary responsibility is to apply the laws of the Commonwealth." *Id.* (citing *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972) ("The basic law is the law of the forum, which should not be displaced without valid reasons.")).  "Kentucky courts have liberally construed the 'any significant contacts' standard in order to further the policies of favoring Kentucky law and avoiding inconsistent results within the Commonwealth." *Dukes*, 2018 WL 6112415, at *3; *see also Osborn*, 865 F.3d at 443. For example, courts apply Kentucky law where the incident giving rise to the suit occurred in Kentucky, despite the presence of significant contacts with other states.  *See, e.g.*, *Reichwein v. Jackson Purchase Energy Corp.*, 397 S.W.3d 413, 416 (Ky. Ct. App. 2012) (applying Kentucky law where the work-related accident giving rise to the claim occurred in Kentucky, even though the decedent was a Minnesota resident who entered an employment contract in Minnesota with a Minnesota employer).  Moreover, Kentucky courts will apply Kentucky law even where the injury occurred in another state so long as other significant contacts with Kentucky exist.  *See, e.g.*, *Foster*, 484 S.W.2d at 827–29 (applying Kentucky law because the car-crash victim was a Kentucky resident and the defendant driver had connections to Kentucky, even though the defendant resided in Ohio and the accident occurred in Ohio).  At bottom, the Court "is not to weigh different states' interests in the case, but rather must make the determination 'simply on the basis of whether Kentucky has enough contacts to justify applying Kentucky law.'" *Novolex Holdings, LLC v. Wurzburger*, No. CV 19-145-DLB-CJS, 2020 WL 4758360, at *5 (E.D. Ky. Aug. 17, 2020) (quoting *Arnett v. Thompson*, 433 S.W.2d 109, 113 (Ky. 1968)).

36

In light of these principles, as well as Kentucky's "extremely strong and highly unusual preference for applying Kentucky law even in situations where most states would decline to apply their own laws," *Osborn*, 865 F.3d at 443, Kentucky law applies to Plaintiffs' tort claims. Significantly, Yum is headquartered and has its principal place of business in Kentucky (D.N. 52-1, PageID.567 ¶ 3) and is the parent corporation of the subsidiaries and franchisees that employed the putative class members and collected their PII.  (*See id.*, PageID.568 ¶¶ 3, 5)  In addition, Yum does not dispute that many individuals who lived and worked for a Yum company in Kentucky are presumably included in Plaintiffs' putative nationwide class.[27]  This alone is a significant contact warranting the application of Kentucky law.  *See, e.g.*, *Novolex*, 2020 WL 4758360, at *5 ("[T]he residence of a plaintiff in Kentucky is considered such a significant contact that it justifies the application of Kentucky law . . . . [and] it is appropriate for Kentucky law to apply to the tort claims here in light of the fact that two of the Plaintiffs in this case are citizens of Kentucky[.]").  In sum, there is a "significant contact" between Kentucky and Plaintiffs' tort claims, and Kentucky law therefore applies to those claims.  *See Dukes*, 2018 WL 6112415, at *3

### ii.    Contract Claims

Kentucky follows the Second Restatement's "most significant relationship" test to determine contract-based choice-of-law issues.  *Boling v. Prospect Funding Holdings, LLC*, 771 F. App'x 562, 574 (6th Cir. 2019) (citing *Hodgkiss-Warrick*, 413 S.W.3d at 878).  Under that test, the "rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties."  *Id.* (quoting Restatement (Second) Conflict of Laws § 188(1) (Am.

---

[27] The Court observes that named Plaintiff Stinson "is a resident and citizen of the State of Kentucky."  (D.N. 42, PageID.297 ¶ 18)  In any event, because Stinson is no longer a party to this action (*see* D.N. 72; D.N. 75), Stinson's residence is not relevant here.

Law Inst. 1971)).  The Kentucky Supreme Court has noted that this approach ensures "justice, fairness and the best practical result . . . by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Breeding v. Mass. Indem. & Life Ins. Co.*, 633 S.W.2d 717, 719 (Ky. 1982).  In applying the most-significant-relationship test, the Court considers "the place or places of negotiating and contracting; the place of performance; the location of the contract's subject matter; and the domicile, residence, place of incorporation and place of business of the parties." *Id.* (quoting *Hodgkiss-Warrick*, 413 S.W.3d at 878–79).  In other words, unlike the analysis required for Plaintiffs' tort claims, the Court must engage in "a weighing of interests" to determine the law applicable to Plaintiffs' contract claims.  *See McGraw-Hill Glob. Educ., LLC v. Griffin*, No. 5:14-CV-00042-TBR, 2014 WL 5500505, at *7 (W.D. Ky. Oct. 30, 2014) (quotation omitted).

Yum argues that this test weighs against the uniform application of Kentucky law.  (D.N. 53, PageID.845)  Yum notes that "[t]he nationwide class members will have negotiated and entered contracts with a Yum[] subsidiary or independent brand franchisee in every state" and contends that the place of performance thus "would be the state in which the individual class members worked." (*Id.*, PageID.843)  According to Yum, having its headquarters in Kentucky "alone does not create the necessary significant contacts required" to mandate the uniform application of Kentucky law to Plaintiffs' contract claims.  (*Id.*, PageId.845)  Plaintiffs respond that Yum "runs its multinational business out of Kentucky and operates its own IT network" and that Yum "acquires data from franchisees and integrates that data into its IT network."  (D.N. 81, PageID.898)  Plaintiffs also contend that "the crux of the case doesn't concern Plaintiffs' employment but Defendant's receipt and treatment of Plaintiffs' . . . PII and the implicit

38

understanding that Defendant would take measures to protect it." (*Id.*)  Plaintiffs argue that under

this view of the case, and "[g]iven that Defendant is headquartered in Kentucky, it is difficult to

imagine a more significant relationship between Defendant's data security policies and failures

than the state of Kentucky." (*Id.*)

Ultimately, the Court lacks sufficient information to determine whether Kentucky law

applies to Plaintiffs' contract claims.  The fact that Yum is headquartered and has its principal

place of business in Kentucky is, on its own, insufficient to warrant the application of Kentucky

law under the most-significant-relationship test.  *See, e.g.*, *Conrad v. Transit Auth. of N. Ky.*, No.

CV 19-23-DLB-CJS, 2019 WL 6829952, at *9 (E.D. Ky. Dec. 13, 2019) (explaining that "the

residency of either party is not dispositive").  And there are several relevant circumstances that are

unresolved by the current record.  For example, in the data-breach context, "the location of the

breached network" is relevant to the most-significant-relationship analysis.  *See, e.g.*, *Brooks v.

Peoples Bank*, 732 F. Supp. 3d 765, 778 (S.D. Ohio 2024).  But the current record does not show

where Yum's "breached network" was located.  *See id.*  Additionally, Plaintiffs assert an implied-

contract theory regarding the safeguarding of their PII (*see* D.N. 42, PageID.348), but it is unclear

exactly where the implied contract's "place of performance" or "subject matter" are located.  *See

Breeding*, 633 S.W.2d at 719.  Further information detailing where Yum's data-security policies

were created and managed, as well as where Plaintiffs' PII was stored, is necessary to properly

resolve this issue.

Plaintiffs argue in the alternative that the Court should defer the choice-of-law analysis

until after discovery.  (D.N. 81, PageID.899)  Courts routinely decline to decide complicated

choice-of-law issues at the pleading stage.  *See, e.g.*, *Diamond Transp. Logistics, Inc. v. Kroger

Co.*, No. 2:19-CV-5448, 2021 WL 3929802, at *4 (S.D. Ohio Sept. 2, 2021) (declining "to

undertake the choice-of-law analysis at [the pleading stage], in favor of allowing the factual record . . . to more fully develop"); *Lunkenheimer Co. v. Pentair Flow Control Pac. PTY Ltd.*, No. 1:11-CV-824, 2014 WL 4450034, at *4 (S.D. Ohio Sept. 10, 2014) ("Where, as here, the choice of law analysis is a complicated, fact-intensive jumble, courts routinely decline to determine the issue at the motion to dismiss stage."); *see also Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 718 (6th Cir. 2015) (reversing district court's granting of judgment on the pleadings where the pleadings did "not provide sufficient facts to make a determination on" choice of law). Given these authorities and the factual gaps in the record on matters relevant to the most-significant-relationship analysis, the Court will defer a ruling on the law applicable to Plaintiffs' contract claims until after discovery.

### 3.     Rule 23

Yum argues that Plaintiffs' nationwide class allegations must be struck because Plaintiffs' claims "contain shifting elements of proof that vary across their states of residence" and assert causes of action "that some states do not even recognize." (D.N. 53, PageID.836) Yum thus contests Plaintiffs' ability to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members," as required by Federal Rule of Civil Procedure 23(b)(3). *See* Fed. R. Civ. P. 23(b)(3). But Yum has failed to demonstrate that "it will be impossible to certify the class as alleged, regardless of the facts [Plaintiffs] may be able to prove." *Eldridge*, 2017 WL 4364205, at *7. As discussed above, Kentucky law applies uniformly to Plaintiffs' tort claims, and additional discovery is required to determine what law applies to Plaintiffs' contract claims. As a result, Yum's motion to strike is premature, and the Court will deny the motion. *See Eliason v. Gentek Bldg. Prods., Inc.*, No. 1:10CV02093, 2011 WL 3704823, at *3 (N.D. Ohio Aug. 23, 2011) (rejecting defendant's motion to strike class

allegations based on purported application of different states' laws and explaining that "[w]hile raising possibly valid concerns, Defendants' arguments on class certification are premature [because] [w]hether the commonality requirement has been demonstrated cannot be determined until discovery has taken place"); *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 946–48 (E.D. Mich. 2022) (declining motion to strike nationwide class allegations at the pleading stage as premature).

### D.    Rule 12(b)(6)

Finally, Yum argues that Plaintiffs' claims should be dismissed under Rule of Civil Procedure 12(b)(6). (D.N. 51, PageID.816–26) Because further discovery is required to determine the law applicable to Plaintiffs' contract claims, the Court will defer a ruling on Yum's arguments regarding those claims. *See Eliason*, 2011 WL 3704823, at *2–3 (refusing to strike class allegations and declining to engage in an extensive Rule 12(b)(6) analysis because the issue of whether certification would require application of multiple states' laws "cannot be determined until discovery has taken place and choice of law provisions applied"); *see also Bowen v. Paxton Media Grp., LLC*, No. 5:21-CV-00143-GNS, 2022 WL 4110319, at *7 (W.D. Ky. Sept. 8, 2022) (refusing to dismiss claim under Rule 12(b)(6) where it was "uncertain which states' laws would apply"). Still, because Kentucky law applies to Plaintiffs' tort claims, the Court will now examine Yum's arguments regarding those claims.

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* Factual allegations are essential; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and the Court need not accept such statements as true. *Id.* A complaint whose "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" will not withstand a motion to dismiss. *Id.* at 679. When considering a motion to dismiss, "a district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009)).

### 1.    Negligence

Under Kentucky law, negligence is defined as "the failure to discharge a legal duty, whereby injury occurs." *Doe v. Dordoni*, No. 1:16-CV-74-DJH-HBB, 2021 WL 6144794, at *2 (W.D. Ky. Sept. 28, 2021) (quoting *Warren v. Winkle*, 400 S.W.3d 755, 758 (Ky. Ct. App. 2013)). "In any negligence action under Kentucky law, a plaintiff must prove the existence of a duty, breach thereof, causation, and damages . . . ." *Id.* (quoting *Boland-Maloney Lumber Co. v. Burnett*, 302 S.W.3d 680, 686 (Ky. Ct. App. 2009)). Yum attacks the sufficiency of Plaintiffs' negligence claim on two grounds. First, Yum argues that Plaintiffs' "allegations of damages are too speculative to state a claim for negligence." (D.N. 51, PageID.817) Specifically, Yum contends that courts have "held that injuries such as increased risk of identity theft and associated monitoring costs, diminution of value in PII, and lost time are not sufficient to plead negligence damages." (*Id.*) Second, Yum asserts that Plaintiffs have failed to adequately allege that Yum owed Plaintiffs any duty. (*Id.*, PageID.818)

Yum's arguments fail. As to damages, Yum relies almost entirely on a 2017 ruling in *Savidge* that "allegations about heightened risks and the possibility of future harm are insufficient"

in the data-breach context to allege negligence damages under Kentucky law.[28]   (D.N. 51, PageID.817 (quoting *Savidge v. Pharm-Save, Inc.*, No. 3:17-CV-00186-TBR, 2017 WL 5586972, at *3 (W.D. Ky. Dec. 1, 2017))  But in that decision, the Court also explained that pleadings that "allow the Court to draw the reasonable inference that [a plaintiff's] alleged expenses [arising from a data breach] were incurred justifiably" are sufficient to plead negligence damages.  *Savidge*, 2017 WL 5586972, at *6.  Here, Plaintiffs allege that they have "incurred . . . damages in the form of . . . costs of engaging adequate credit monitoring and identity theft protection services."  (D.N. 42, PageID.319 ¶ 118)  In addition, Plaintiffs allege several circumstances indicating that these costs were incurred justifiably, such as that their PII was stolen by cyber-criminals and is likely accessible on the dark web.  (*See, e.g.*, D.N. 42, PageID.304–15 ¶¶ 57–105)  At the motion-to-dismiss stage, where Plaintiffs' allegations must be taken as true and all inferences must be drawn in Plaintiffs' favor, *Tackett*, 561 F.3d at 488, these allegations are sufficient.  *See Savidge*, 2017 WL 5586972, at *6 (concluding that plaintiffs had adequately pleaded damages in a data-breach case under Kentucky law); *see also McKenzie v. Allconnect, Inc.*, 369 F. Supp. 3d 810, 818 (E.D. Ky. 2019) (same).

    Yum's duty argument also fails.  Under Kentucky law, "[a]s a general rule, an actor whose own conduct has not created a risk of harm has no duty to control the conduct of a third person to prevent him from causing harm to another."  *Reed v. Gulf Coast Enters.*, No. 3:15-CV-00295-JHM, 2016 WL 79998, at *10 (W.D. Ky. Jan. 6, 2016) (quoting *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 849 (Ky. 2005)).  Importantly, however, a duty "to exercise

---

[28] The other cases cited by Yum (*see* D.N. 51, PageID.817) did not involve the application of Kentucky law and are therefore inapposite.  *See Storm v. Paytime, Inc.*, 90 F. Supp. 3d 359, 367–68 (M.D. Pa. 2015) (analyzing standing); *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 405 (E.D. Va. 2020) (Virginia law); *Lovell v. P.F. Chang's China Bistro, Inc.*, No. C14-1152RSL, 2015 WL 4940371, at *2 (W.D. Wash. Mar. 27, 2015) (Washington law).

reasonable care to prevent harm by controlling a third person's conduct" can arise where "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection." *Id.* at *10 (quotation omitted). "The employer-employee relation is one such special relationship that can give rise" to a duty to protect. *Id.* at *9.

Here, the remaining plaintiffs in the case—Doss, Farley, and Sidler—each allege an employment relationship with Yum wherein they were required to provide PII as a condition of employment. (D.N. 42, PageID.328 ¶ 160; *id.*, PageID.332 ¶ 183; *id.*, PageID.336 ¶ 205) Plaintiffs allege that these circumstances created a special relationship between themselves and Yum that required Yum to take reasonable steps to safeguard Plaintiffs' PII from unauthorized third parties. (*Id.*, PageID.343–44 ¶ 238) Courts in this circuit regularly apply this theory of liability in data-breach suits under Kentucky law. *See, e.g.*, *McKenzie*, 369 F. Supp. 3d at 818 ("The Plaintiffs have provided sufficient information in the complaint to demonstrate that they were obligated to provide sensitive personal information to Allconnect as a condition of their employment. As a result, while Allconnect may not have had a duty to protect its employees from unknown or unforeseen third-parties, Allconnect did have a duty to prevent foreseeable harm to its employees and, as part of that duty, had a duty to safeguard the sensitive personal information of its employees from unauthorized release or theft."); *see also Savidge v. Pharm-Save, Inc.*, No. 3:17-CV-186-CHB, 2025 WL 964446, at *7 (W.D. Ky. Mar. 31, 2025) (noting that "multiple federal district courts have denied motions to dismiss on this issue, finding that, under Kentucky law, the complaints at issue sufficiently alleged that the employer-defendants had a duty to take reasonable steps to safeguard the sensitive personal information that their employees were

obligated to provide as conditions of their employment"). Thus, Plaintiffs' allegations are sufficient to plead a duty under Kentucky law.[29]

### 2.    Invasion of Privacy

Plaintiffs assert an invasion-of-privacy claim "based upon Plaintiffs' unreasonable intrusion upon seclusion." (D.N. 82, PageID.934)  Under Kentucky law, to plead intrusion upon seclusion a plaintiff must sufficiently allege "(1) an intentional intrusion by defendant, (2) into a matter that plaintiff has a right to keep private, and (3) which is highly offensive to a reasonable person." *Lurry v. PharMerica Corp.*, No. 3:23-CV-297-RGJ, 2024 WL 2965642, at *6 (W.D. Ky. June 12, 2024).  Yum argues that Plaintiffs' intrusion claim fails because "Plaintiffs do not allege any facts supporting that Yum[] *intentionally* disclosed their information." (D.N. 51, PageID.824) Plaintiffs respond that they sufficiently allege that Yum acted with "reckless disregard" for their privacy and that "[w]hether [Yum] acted with such reckless disregard for Plaintiffs' privacy to amount to an intentional tort is clearly a factual issue." (D.N. 82, PageID.934)

For the purposes of an intrusion-upon-seclusion claim, "[a] defendant's actions may be intentional when the Defendant acts with such reckless disregard for the privacy of the plaintiff that the actions rise to the level of being an intentional tort." *McKenzie,* 369 F. Supp. 3d at 819 (citing *Smith v. Bob Smith Chevrolet, Inc.*, 275 F. Supp. 2d 808, 822 (W.D. Ky. 2003)).  Based on this principle, "[c]ourts have repeatedly held that being aware of the risk of data breaches and failing to implement appropriate policies is sufficient to state a claim for intrusion upon seclusion."

---

[29] Yum attempts to distinguish these authorities by stressing that Plaintiffs are *former* employees. (D.N. 89, PageID.889)  But *McKenzie* also involved former employees.  369 F. Supp. 3d at 813–14, 818.  Moreover, the Kentucky case cited by Yum for the proposition that a special relationship cannot arise between employers and former employees involved a duty to warn, not a duty to safeguard PII, and is therefore distinguishable.  *See Johnson v. United Parcel Serv., Inc.*, 326 S.W.3d 812, 816–17 (Ky. Ct. App. 2010); *cf. McKenzie*, 369 F. Supp. 3d at 818.

*See Lurry*, 2024 WL 2965642 at *6 (collecting cases). Here, Plaintiffs have alleged that Yum was aware of the risk of data breaches and yet failed to take numerous steps to adequately safeguard Plaintiffs' PII. (*See, e.g.*, D.N. 42, PageID.299–300 ¶¶ 32–36; *see also id.*, PageID.307–12 ¶¶ 74–92; *id.*, PageID.303 ¶¶ 48–56) Moreover, Plaintiffs allege that Yum had "actual knowledge that its information security practices were inadequate and insufficient." (*Id.*, PageID.353 ¶ 290) Such allegations are sufficient at the motion-to-dismiss stage. *See Lurry*, 2024 WL 2965642 at *6 (collecting cases).

### 3.    Breach of Confidence

Yum argues that Kentucky "does not recognize a claim for breach of confidence." (D.N. 51, PageID.825) Plaintiffs do not cite any cases outlining the elements of breach of confidence under Kentucky law, and the Court is aware of none. To the contrary, at least one court in this district has concluded that "no such cause of action exists for data breach claims in Kentucky." *See Viviali v. One Point HR Sols., LLC*, No. CV 2:24-185-DCR, 2025 WL 1158740, at *7 (E.D. Ky. Apr. 21, 2025). Moreover, as Yum rightly notes (D.N. 89, PageID.993–94), several of the cases cited by Plaintiffs regarding this claim (D.N. 82, PageID.935–36) did not involve the application of Kentucky law. *See Thomas v. TOMS King (Ohio), LLC*, 997 F.3d 629, 640 (6th Cir. 2021) (analyzing common-law elements for standing purposes); *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 409 (E.D. Va. 2020) (analyzing under Virginia, Florida, and California law). The one case cited by Plaintiffs that did involve Kentucky law did not meaningfully discuss the elements of a breach-of-confidence tort claim, but rather merely noted that "constructive trusts may be imposed as a remedy associated with claims of . . . breach of confidence." *Bell v. Jefferson*, No. 5:18-CV-32-CHB, 2021 WL 1233457, at *18 (E.D. Ky. Mar. 31, 2021).

Absent authority indicating that Kentucky courts would recognize Plaintiffs' breach-of-confidence claim, the Court must dismiss it.  *See, e.g.*, *Ashcroft*, 556 U.S. at 678 (requiring plaintiffs to "state a claim to relief that is plausible on its face"); *ACT for Health v. United Energy Workers Healthcare Corp*., No. 5:15-CV-00195-TBR-LLK, 2018 WL 2090819, at *3–6 (W.D. Ky. May 4, 2018) (explaining that courts may grant a motion to dismiss if "the complaint . . . fails to allege a plausible theory of relief" and dismissing unfair-competition claim where plaintiff failed to articulate a cognizable theory under Kentucky law).

### 4.    Declaratory Judgment

Plaintiffs seek a declaratory judgment and corresponding injunctive relief.  (D.N. 42, PageID.357–59 ¶¶ 311–19)   Plaintiffs allege that Yum's "data security measures remain inadequate" and that they "will continue to suffer injury as a result of the compromise of their Personal Information and remain at imminent risk that further compromises of their Personal Information will occur in the future."  (*Id.*, PageID.357 ¶ 314)  Specifically, Plaintiffs seek a judgment declaring that Yum "continues to owe a legal duty to secure current and former employees' private information and to timely notify employees and former employees of a data breach" and that Yum "continues to breach this legal duty by failing to employ reasonable" data-security measures.  (*Id.*, PageID.357–58 ¶ 315)  Plaintiffs request "prospective injunctive relief requiring that Yum! Brands employ adequate security protocols consistent with law and industry standards to protect private Information."  (*Id.*, PageID.358 ¶ 316)

Yum moves to dismiss Plaintiffs' declaratory-judgment claim.  Yum first argues that "all the other claims should be dismissed and the Declaratory Judgment Act does not create an independent cause of action."  (D.N. 51, PageID.826 (internal quotations omitted).  But as discussed above, Plaintiffs have articulated cognizable claims for negligence and invasion of

privacy.  In addition, Plaintiffs' contract claims may survive depending on the choice-of-law determination following discovery.  Thus, Plaintiffs are not bringing an independent declaratory-judgment claim, and this argument fails.

In addition, Yum argues that the declaratory-judgment claim should be dismissed because "it would be duplicative of the relief [Plaintiffs] seek under the other causes of action regarding" Yum's security policies and the data breach.  (*Id.*)  Yum's argument on this point is largely perfunctory, consisting of a single sentence with one case citation.  (*See id.*)  Thus, the Court need not analyze this issue.  *Cockrun v. Berrien Cnty.*, 101 F.4th 416 (6th Cir. 2024) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  In any event, even if Yum is correct that Plaintiffs' declaratory-judgment claim is duplicative, the Court need not dismiss duplicative declaratory-judgment claims at the motion-to-dismiss stage.  *See, e.g.*, *Lion Fed. Credit Union v. Worldpay*, LLC, No. 1:24-CV-163, 2024 WL 1704551, at *12 (S.D. Ohio Apr. 19, 2024), supplemented, No. 1:24-CV-163, 2024 WL 2701700 (S.D. Ohio May 24, 2024) (collecting cases).  Moreover, courts have permitted declaratory-judgment claims to proceed alongside tort and contract-based claims in the data-breach context where the declaratory judgment would "provide . . . more complete relief" by "clarify[ing] the prospective obligations which [the] [d]efendant may have to protect Plaintiffs' information." *Finesse Express, LLC v. Total Quality Logistics, LLC*, No. 1:20-CV-235, 2021 WL 1192521, at *8–9 (S.D. Ohio Mar. 30, 2021) (declining to dismiss declaratory judgment as duplicative in the data-breach context).  As a result, Yum's arguments fail, and Plaintiffs' declaratory-judgment claim may proceed.

## III.    CONCLUSION

For the reasons set out above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)    Yum's motion to dismiss (D.N. 51) is **GRANTED** in part and **DENIED** in part. The motion is **GRANTED** with respect to Plaintiffs' breach-of-confidence claim (Count Six). The motion is **DENIED** with respect to standing and Plaintiffs' negligence (Count One), invasion-of-privacy (Count Four), and declaratory-judgment claims (Count Seven). The motion is **DENIED** without prejudice pending discovery on choice-of-law issues to the extent it seeks dismissal of Plaintiffs' contract claims (Counts Two, Three, and Five).

(2)    Yum's motion to compel arbitration (D.N. 52) is **GRANTED** in part and **DENIED** in part. The motion is **GRANTED** with respect to Beasley. Beasley and Yum are **COMPELLED** to arbitrate the claims asserted by Beasley. Beasley's claims are **STAYED** pending arbitration. The parties **SHALL** submit a joint status report every 90 days and promptly report on the outcome of the arbitration. The motion is **DENIED** with respect to Doss.

(3)    Yum's motion to strike (D.N. 53) is **DENIED**.

(4)    The Court requests that U.S. Magistrate Judge Lanny King hold a status conference to set a final litigation schedule.

August 29, 2025

**David J. Hale, Judge**
**United States District Court**

49